## FRISBY ET AL. *v.* SCHULTZ ET AL.

No. 87–168.   Argued April 20, 1988—Decided June 27, 1988

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, SCALIA, and KENNEDY, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 488. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 491. STEVENS, J., filed a dissenting opinion, *post*, p. 496.

*Harold H. Fuhrman* argued the cause and filed briefs for appellants.

*Steven Frederick McDowell* argued the cause for appellees. With him on the brief was *Walter M. Weber.**

---

*Briefs of *amici curiae* urging reversal were filed for the National Institute of Municipal Law Officers by *William I. Thornton, Jr., Roy D. Bates, William H. Taube, Roger F. Cutler, Robert J. Alfton, James K. Baker, Joseph N. deRaismes, Frank B. Gummey III, Robert J. Mangler, Neal E. McNeill, Analeslie Muncy, Dante R. Pellegrini, Clifford D. Pierce, Jr., Charles S. Rhyne,* and *Benjamin L. Brown;* for the National League of Cities et al. by *Benna Ruth Solomon* and *Mark B. Rotenberg;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robin L. Rivett.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Harvey Grossman, Jane M. Whicher, Jonathan K. Baum, John A. Powell, Steven R. Shapiro,* and *William Lynch;* for the American Federation of Labor and Congress of Industrial Orga-

JUSTICE O'CONNOR delivered the opinion of the Court.

Brookfield, Wisconsin, has adopted an ordinance that completely bans picketing "before or about" any residence. This case presents a facial First Amendment challenge to that ordinance.

I

Brookfield, Wisconsin, is a residential suburb of Milwaukee with a population of approximately 4,300. The appellees, Sandra C. Schultz and Robert C. Braun, are individuals strongly opposed to abortion and wish to express their views on the subject by picketing on a public street outside the Brookfield residence of a doctor who apparently performs abortions at two clinics in neighboring towns. Appellees and others engaged in precisely that activity, assembling outside the doctor's home on at least six occasions between April 20, 1985, and May 20, 1985, for periods ranging from one to one and a half hours. The size of the group varied from 11 to more than 40. The picketing was generally orderly and peaceful; the town never had occasion to invoke any of its various ordinances prohibiting obstruction of the streets, loud and unnecessary noises, or disorderly conduct. Nonetheless, the picketing generated substantial controversy and numerous complaints.

The Town Board therefore resolved to enact an ordinance to restrict the picketing. On May 7, 1985, the town passed an ordinance that prohibited all picketing in residential neighborhoods except for labor picketing. But after reviewing this Court's decision in *Carey* v. *Brown*, 447 U. S. 455 (1980), which invalidated a similar ordinance as a violation of the

nizations by *Marsha S. Berzon* and *Laurence Gold;* and for the Rutherford Institute et al. by *Robert R. Melnick, William Bonner, John F. Southworth, Jr., W. Charles Bundren, Alfred J. Lindh, Ira W. Still III, William B. Hollberg, Randall A. Pentiuk, Thomas W. Strahan, John W. Whitehead, A. Eric Johnston,* and *David E. Morris.*

*Charles E. Rice, Thomas Patrick Monaghan,* and *James M. Henderson, Sr.,* filed a brief for the American Life League, Inc., et al. as *amici curiae.*

Equal Protection Clause, the town attorney instructed the police not to enforce the new ordinance and advised the Town Board that the ordinance's labor picketing exception likely rendered it unconstitutional. This ordinance was repealed on May 15, 1985, and replaced with the following flat ban on all residential picketing:

> "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." App. to Juris. Statement A–28.

The ordinance itself recites the primary purpose of this ban: "the protection and preservation of the home" through assurance "that members of the community enjoy in their homes and dwellings a feeling of well-being, tranquility, and privacy." *Id.*, at A–26. The Town Board believed that a ban was necessary because it determined that "the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants . . . [and] has as its object the harassing of such occupants." *Id.*, at A–26—A–27. The ordinance also evinces a concern for public safety, noting that picketing obstructs and interferes with "the free use of public sidewalks and public ways of travel." *Id.*, at A–27.

On May 18, 1985, appellees were informed by the town attorney that enforcement of the new, revised ordinance would begin on May 21, 1985. Faced with this threat of arrest and prosecution, appellees ceased picketing in Brookfield and filed this lawsuit in the United States District Court for the Eastern District of Wisconsin. The complaint was brought under 42 U. S. C. § 1983 and sought declaratory as well as preliminary and permanent injunctive relief on the grounds that the ordinance violated the First Amendment. Appellees named appellants—the three members of the Town Board, the Chief of Police, the town attorney, and the town itself—as defendants.

The District Court granted appellees' motion for a preliminary injunction. The court concluded that the ordinance was not narrowly tailored enough to restrict protected speech in a public forum. 619 F. Supp. 792, 797 (1985). The District Court's order specified that unless the appellants requested a trial on the merits within 60 days or appealed, the preliminary injunction would become permanent. Appellants requested a trial and also appealed the District Court's entry of a preliminary injunction.

A divided panel of the United States Court of Appeals for the Seventh Circuit affirmed. 807 F. 2d 1339 (1986). The Court of Appeals subsequently vacated this decision, however, and ordered a rehearing en banc. 818 F. 2d 1284 (1987). After rehearing, the Court of Appeals affirmed the judgment of the District Court by an equally divided vote. 822 F. 2d 642 (1987). Contending that the Court of Appeals had rendered a final judgment holding the ordinance "to be invalid as repugnant to the Constitution," 28 U. S. C. § 1254 (2), appellants attempted to invoke our mandatory appellate jurisdiction. App. to Juris. Statement A–25 (citing § 1254 (2)). We postponed further consideration of our appellate jurisdiction until the hearing on the merits. 484 U. S. 1003 (1988).

Appellees argue that there is no jurisdiction under § 1254 (2) due to the lack of finality. They point out that the District Court entered only a preliminary injunction and that appellants requested a trial on the merits, which has yet to be conducted. These considerations certainly suggest a lack of finality. Yet despite the formally tentative nature of its order, the District Court appeared ready to enter a final judgment since it indicated that unless a trial was requested a permanent injunction would issue. In addition, while appellants initially requested a trial, they no longer adhere to this position and now say that they would have no additional arguments to offer at such a trial. Tr. of Oral Arg. 7. In the context of this case, however, there is no need to decide

whether jurisdiction is proper under § 1254(2). Because the question presented is of substantial importance, and because further proceedings below would not likely aid our consideration of it, we choose to avoid the finality issue simply by granting certiorari. Accordingly, we dismiss the appeal and, treating the jurisdictional statement as a petition for certiorari, now grant the petition. See 28 U. S. C. § 2103. Cf. *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore, ante,* at 369, n. 10. For convenience, however, we shall continue to refer to the parties as appellants and appellees, as we have in previous cases. See *ibid.; Peralta* v. *Heights Medical Center, Inc.,* 485 U. S. 80, 84, n. 4 (1988).

## II

The antipicketing ordinance operates at the core of the First Amendment by prohibiting appellees from engaging in picketing on an issue of public concern. Because of the importance of "uninhibited, robust, and wide-open" debate on public issues, *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964), we have traditionally subjected restrictions on public issue picketing to careful scrutiny. See, *e. g., Boos* v. *Barry,* 485 U. S. 312, 318 (1988); *United States* v. *Grace,* 461 U. S. 171 (1983); *Carey* v. *Brown,* 447 U. S. 455 (1980). Of course, "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.,* 473 U. S. 788, 799 (1985).

To ascertain what limits, if any, may be placed on protected speech, we have often focused on the "place" of that speech, considering the nature of the forum the speaker seeks to employ. Our cases have recognized that the standards by which limitations on speech must be evaluated "differ depending on the character of the property at issue." *Perry Education Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 44 (1983). Specifically, we have identified three types of fora: "the traditional public forum, the public forum created

by government designation, and the nonpublic forum." *Cornelius, supra,* at 802.

The relevant forum here may be easily identified: appellees wish to picket on the public streets of Brookfield. Ordinarily, a determination of the nature of the forum would follow automatically from this identification; we have repeatedly referred to public streets as the archetype of a traditional public forum. See, *e. g., Boos* v. *Barry, supra,* at 318; *Cornelius, supra,* at 802; *Perry,* 460 U. S., at 45. "[T]ime out of mind" public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum. See *ibid.; Hague* v. *CIO,* 307 U. S. 496, 515 (1939) (Roberts, J.). Appellants, however, urge us to disregard these "clichés." Tr. of Oral Arg. 16. They argue that the streets of Brookfield should be considered a nonpublic forum. Pointing to the physical narrowness of Brookfield's streets as well as to their residential character, appellants contend that such streets have not by tradition or designation been held open for public communication. See Brief for Appellants 23 (citing *Perry, supra,* at 46).

We reject this suggestion. Our prior holdings make clear that a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood. In *Carey* v. *Brown*—which considered a statute similar to the one at issue here, ultimately striking it down as a violation of the Equal Protection Clause because it included an exception for labor picketing—we expressly recognized that "public streets and sidewalks in residential neighborhoods," were "public for[a]." 447 U. S., at 460–461. This rather ready identification virtually forecloses appellants' argument. See also *Perry, supra,* at 54–55 (noting that the "key" to *Carey* "was the presence of a public forum").

In short, our decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a "cliché," but recognition that "[w]herever the title of

streets and parks may rest, they have immemorially been held in trust for the use of the public." *Hague* v. *CIO, supra,* at 515 (Roberts, J.). No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora. Accordingly, the streets of Brookfield are traditional public fora. The residential character of those streets may well inform the application of the relevant test, but it does not lead to a different test; the anti-picketing ordinance must be judged against the stringent standards we have established for restrictions on speech in traditional public fora:

> "In these quintessential public for[a], the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . . The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry, supra,* at 45 (citations omitted).

As *Perry* makes clear, the appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content. Appellees argue that despite its facial content-neutrality, the Brookfield ordinance must be read as containing an implied exception for labor picketing. See Brief for Appellees 20–26. The basis for appellees' argument is their belief that an express protection of peaceful labor picketing in state law, see Wis. Stat. § 103.53(1) (1985–1986), must take precedence over Brookfield's contrary efforts. The District Court, however, rejected this suggested interpretation of state law, 619 F. Supp., at 796, and the Court of Appeals affirmed, albeit ultimately by an equally divided court. 822 F. 2d 642 (1987).

See also 807 F. 2d, at 1347 (original panel opinion declining to reconsider District Court's construction of state law). Following our normal practice, "we defer to the construction of a state statute given it by the lower federal courts . . . to reflect our belief that district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States." *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 499–500 (1985). See *Virginia* v. *American Booksellers Assn.*, 484 U. S. 383, 395 (1988) ("This Court rarely reviews a construction of state law agreed upon by the two lower federal courts"). Thus, we accept the lower courts' conclusion that the Brookfield ordinance is content neutral. Accordingly, we turn to consider whether the ordinance is "narrowly tailored to serve a significant government interest" and whether it "leave[s] open ample alternative channels of communication." *Perry*, 460 U. S., at 45.

Because the last question is so easily answered, we address it first. Of course, before we are able to assess the available alternatives, we must consider more carefully the reach of the ordinance. The precise scope of the ban is not further described within the text of the ordinance, but in our view the ordinance is readily subject to a narrowing construction that avoids constitutional difficulties. Specifically, the use of the singular form of the words "residence" and "dwelling" suggests that the ordinance is intended to prohibit only picketing focused on, and taking place in front of, a particular residence. As JUSTICE WHITE's concurrence recounts, the lower courts described the ordinance as banning "all picketing in residential areas." *Post*, at 490. But these general descriptions do not address the exact scope of the ordinance and are in no way inconsistent with our reading of its text. "Picketing," after all, is defined as posting at a particular place, see Webster's Third New International Dictionary 1710 (1981), a characterization in line with viewing the ordinance as limited to activity focused on a single residence.

Moreover, while we ordinarily defer to lower court constructions of state statutes, see *supra*, at 482, we do not invariably do so, see *Virginia* v. *American Booksellers Assn.*, *supra*, at 395. We are particularly reluctant to defer when the lower courts have fallen into plain error, see *Brockett* v. *Spokane Arcades, Inc.*, *supra*, at 500, n. 9, which is precisely the situation presented here. To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties. See, *e. g.*, *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 216 (1975); *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973). Cf. *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988). Thus, unlike the lower courts' judgment that the ordinance does not contain an implied exception for labor picketing, we are unable to accept their potentially broader view of the ordinance's scope. We instead construe the ordinance more narrowly. This narrow reading is supported by the representations of counsel for the town at oral argument, which indicate that the town takes, and will enforce, a limited view of the "picketing" proscribed by the ordinance. Thus, generally speaking, "picketing would be having the picket proceed on a definite course or route in front of a home." Tr. of Oral Arg. 8. The picket need not be carrying a sign, *id.*, at 14, but in order to fall within the scope of the ordinance the picketing must be directed at a single residence, *id.*, at 9. General marching through residential neighborhoods, or even walking a route in front of an entire block of houses, is not prohibited by this ordinance. *Id.*, at 15. Accordingly, we construe the ban to be a limited one; only focused picketing taking place solely in front of a particular residence is prohibited.

So narrowed, the ordinance permits the more general dissemination of a message. As appellants explain, the limited nature of the prohibition makes it virtually self-evident that ample alternatives remain:

> "Protestors have not been barred from the residential neighborhoods. They may enter such neighborhoods, alone or in groups, even marching. . . . They may go door-to-door to proselytize their views. They may distribute literature in this manner . . . or through the mails. They may contact residents by telephone, short of harassment." Brief for Appellants 41–42 (citations omitted).

We readily agree that the ordinance preserves ample alternative channels of communication and thus move on to inquire whether the ordinance serves a significant government interest. We find that such an interest is identified within the text of the ordinance itself: the protection of residential privacy. See App. to Juris. Statement A–26.

"The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey v. Brown*, 447 U. S., at 471. Our prior decisions have often remarked on the unique nature of the home, "the last citadel of the tired, the weary, and the sick," *Gregory v. Chicago*, 394 U. S. 111, 125 (1969) (Black, J., concurring), and have recognized that "[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." *Carey, supra*, at 471.

One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, cf. *Erznoznik v. City of Jacksonville, supra*, at 210–211; *Cohen v. California*, 403 U. S. 15, 21–22 (1971), the home is different. "That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech . . . does not mean we must be captives everywhere." *Rowan v. Post Office Dept.*, 397 U. S. 728, 738 (1970). Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an abil-

ity to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom. See, *e. g., FCC* v. *Pacifica Foundation,* 438 U. S. 726, 748–749 (1978) (offensive radio broadcasts); *id.,* at 759–760 (Powell, J., concurring in part and concurring in judgment) (same); *Rowan, supra* (offensive mailings); *Kovacs* v. *Cooper,* 336 U. S. 77, 86–87 (1949) (sound trucks).

This principle is reflected even in prior decisions in which we have invalidated complete bans on expressive activity, including bans operating in residential areas. See, *e. g., Schneider* v. *State,* 308 U. S. 147, 162–163 (1939) (handbilling); *Martin* v. *Struthers,* 319 U. S. 141 (1943) (door-to-door solicitation). In all such cases, we have been careful to acknowledge that unwilling listeners may be protected when within their own homes. In *Schneider,* for example, in striking down a complete ban on handbilling, we spoke of a right to distribute literature only "to one willing to receive it." Similarly, when we invalidated a ban on door-to-door solicitation in *Martin,* we did so on the basis that the "home owner could protect himself from such intrusion by an appropriate sign 'that he is unwilling to be disturbed.'" *Kovacs,* 336 U. S., at 86. We have "never intimated that the visitor could insert a foot in the door and insist on a hearing." *Ibid.* There simply is no right to force speech into the home of an unwilling listener.

It remains to be considered, however, whether the Brookfield ordinance is narrowly tailored to protect only unwilling recipients of the communications. A statute is narrowly tailored if it targets and eliminates no more than the exact source of the "evil" it seeks to remedy. *City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 808–810 (1984). A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil. For example; in *Taxpayers for Vincent* we upheld an ordinance that banned all signs on public prop-

erty because the interest supporting the regulation, an esthetic interest in avoiding visual clutter and blight, rendered each sign an evil. Complete prohibition was necessary because "the substantive evil — visual blight — [was] not merely a possible byproduct of the activity, but [was] created by the medium of expression itself." *Id.*, at 810.

The same is true here. The type of focused picketing prohibited by the Brookfield ordinance is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas. See, *e. g.*, *Schneider, supra*, at 162–163 (handbilling); *Martin, supra* (solicitation); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943) (solicitation). See also *Gregory* v. *Chicago, supra* (marching). Cf. *Perry*, 460 U. S., at 45 (in traditional public forum, "the government may not prohibit all communicative activity"). In such cases "the flow of information [is not] into . . . household[s], but to the public." *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 420 (1971). Here, in contrast, the picketing is narrowly directed at the household, not the public. The type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt:

> " 'To those inside . . . the home becomes something less than a home when and while the picketing . . . continue[s]. . . . [The] tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility.'" *Carey, supra*, at 478 (REHNQUIST, J., dissenting) (quoting *Wauwatosa* v. *King*, 49 Wis. 2d 398, 411–412, 182 N. W. 2d 530, 537 (1971)).

In this case, for example, appellees subjected the doctor and his family to the presence of a relatively large group of protesters on their doorstep in an attempt to force the doctor to cease performing abortions. But the actual size of the group is irrelevant; even a solitary picket can invade residential privacy. See *Carey*, 447 U. S., at 478–479 (REHNQUIST, J., dissenting) ("Whether . . . alone or accompanied by others . . . there are few of us that would feel comfortable knowing that a stranger lurks outside our home"). The offensive and disturbing nature of the form of the communication banned by the Brookfield ordinance thus can scarcely be questioned. Cf. *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 83–84 (1983) (STEVENS, J., concurring in judgment) (as opposed to regulation of communications due to the ideas expressed, which "strikes at the core of First Amendment values," "regulations of form and context may strike a constitutionally appropriate balance between the advocate's right to convey a message and the recipient's interest in the quality of his environment").

The First Amendment permits the government to prohibit offensive speech as intrusive when the "captive" audience cannot avoid the objectionable speech. See *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530, 542 (1980). Cf. *Bolger* v. *Youngs Drug Products Corp.*, *supra*, at 72. The target of the focused picketing banned by the Brookfield ordinance is just such a "captive." The resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech. Cf. *Cohen* v. *California*, 403 U. S., at 21–22 (noting ease of avoiding unwanted speech in other circumstances). Thus, the "evil" of targeted residential picketing, "the very presence of an unwelcome visitor at the home," *Carey*, *supra*, at 478 (REHNQUIST, J., dissenting), is "created by the medium of expression itself." See *Taxpayers for Vincent*, *supra*, at 810. Accordingly, the Brookfield ordinance's

complete ban of that particular medium of expression is narrowly tailored.

Of course, this case presents only a facial challenge to the ordinance. Particular hypothetical applications of the ordinance—to, for example, a particular resident's use of his or her home as a place of business or public meeting, or to picketers present at a particular home by invitation of the resident—may present somewhat different questions. Initially, the ordinance by its own terms may not apply in such circumstances, since the ordinance's goal is the protection of residential privacy, App. to Juris. Statement A–26, and since it speaks only of a "residence or dwelling," not a place of business, id., at A–28. Cf. Carey, supra, at 457 (quoting an antipicketing ordinance expressly rendered inapplicable by use of home as a place of business or to hold a public meeting). Moreover, since our First Amendment analysis is grounded in protection of the unwilling residential listener, the constitutionality of applying the ordinance to such hypotheticals remains open to question. These are, however, questions we need not address today in order to dispose of appellees' facial challenge.

Because the picketing prohibited by the Brookfield ordinance is speech directed primarily at those who are presumptively unwilling to receive it, the State has a substantial and justifiable interest in banning it. The nature and scope of this interest make the ban narrowly tailored. The ordinance also leaves open ample alternative channels of communication and is content neutral. Thus, largely because of its narrow scope, the facial challenge to the ordinance must fail. The contrary judgment of the Court of Appeals is

*Reversed.*

JUSTICE WHITE, concurring in the judgment.

I agree with the Court that an ordinance which only forbade picketing before a single residence would not be unconstitutional on its face. If such an ordinance were applied to the kind of picketing that appellees carried out here, it

clearly would not be invalid under the First Amendment, for the picketing in this case involved large groups of people, ranging at various times from 11 individuals to more than 40. I am convinced, absent more than this record indicates, that if some single-residence picketing by smaller groups could not be forbidden, the range of possibly unconstitutional application of such an ordinance would not render it substantially overbroad and thus unconstitutional on its face.

This leaves the question, however, whether the ordinance at issue in this case forbids only single-residence picketing. The Court says that the language of the ordinance suggests that it is so limited. But the ordinance forbids "any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." Brookfield, Wis., Gen. Code § 9.17(2), App. to Juris. Statement A–28. That language could easily be construed to reach not only picketing before a single residence, but also picketing that would deliver the desired message about a particular residence to the neighbors and to other passersby. Arguably, it would also reach picketing that is directed at the residences which are located in entire blocks or in larger residential areas. Indeed, the latter is the more natural reading of the ordinance, which seems to prohibit picketing in any area that is located "before or about" any residence or dwelling in the town, i. e., any picketing that occurs either in front of or anywhere around the residences that are located within the town.

Furthermore, there is no authoritative construction of this ordinance by the Wisconsin state courts that limits the scope of the proscription. There is, however, the interpretation that has been rendered in this case by both the lower federal courts with jurisdiction over the town whose law is at issue, which we rarely overturn and to which we routinely defer unless there is some fairly compelling argument for not doing so—an established practice that the Court relies on to resolve another aspect of this case. *Ante*, at 482. As I understand

the District Court, it did not accept the construction of the ordinance which is urged here, holding instead that the ordinance was not narrowly tailored to meet the town's stated objectives, but "completely bans all picketing in residential neighborhoods," 619 F. Supp. 792, 797 (ED Wis. 1985), and is not "a constitutional time, place, and manner regulation of speech in a public forum," *id.*, at 798. The panel that heard this case in the Court of Appeals, the opinion of which was of course vacated below, also thought that the question raised by the ordinance concerned the general validity of picketing "*in a residential neighborhood,*" 807 F. 2d 1339, 1348 (CA7 1986) (emphasis in original), and observed that the ordinance "restricts picketing" in the town "to the commercial strip along West Bluemound Road," *ibid.* The dissenting judge also understood the ordinance to have confined the ambit of lawful picketing to "any non-residential area." *Id.*, at 1356 (Coffey, J., dissenting). Finally, I do not read the briefs filed by appellants in this Court to have argued that the ordinance should be narrowly construed to apply only to single-residence picketing. To the contrary, appellants' briefs in this Court repeatedly refer to the ordinance as banning all picketing in residential areas. Brief for Appellants 12–13, 13, 41, 42, 43; Reply Brief for Appellants 2, 8.

The Court endorses a narrow construction of the ordinance by relying on the town counsel's representations, made at oral argument, that the ordinance forbids only single-residence picketing. In light of the view taken by the lower federal courts and the apparent failure of counsel below to press on those courts the narrowing construction that has been suggested here, I have reservations about relying on counsel's statements as an authoritative statement of the law. It is true that several times in the past the Court, in reaching its decision on the validity of a statute, has relied on what it considered to be reliable and perhaps binding representations made by state and federal officials as to how a particular statute will be enforced. *DeFunis* v. *Odegaard*, 416 U. S. 312,

317–318 (1974); *Ehiert* v. *United States*, 402 U. S. 99, 107 (1971); *Gerende* v. *Board of Supervisors of Elections of Baltimore*, 341 U. S. 56 (1951). But in none of these cases did the Court accept a suggested limiting construction of a state law that appears to be contrary to the views of the lower federal courts.

There is nevertheless sufficient force in the town counsel's representations about the reach of the ordinance to avoid application of the overbreadth doctrine in this case, which as we have frequently emphasized is such "strong medicine" that it "has been employed by the Court sparingly and only as a last resort." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973). In my view, if the ordinance were construed to forbid all picketing in residential neighborhoods, the overbreadth doctrine would render it unconstitutional on its face and hence prohibit its enforcement against those, like appellees, who engage in single-residence picketing. At least this would be the case until the ordinance is limited in some authoritative manner. Because the representations made in this Court by the town's legal officer create sufficient doubts in my mind, however, as to how the ordinance will be enforced by the town or construed by the state courts, I would put aside the overbreadth approach here, sustain the ordinance as applied in this case, which the Court at least does, and await further developments.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The Court today sets out the appropriate legal tests and standards governing the question presented, and proceeds to apply most of them correctly. Regrettably, though, the Court errs in the final step of its analysis, and approves an ordinance banning significantly more speech than is necessary to achieve the government's substantial and legitimate goal. Accordingly, I must dissent.

The ordinance before us absolutely prohibits picketing "before or about" any residence in the town of Brookfield,

thereby restricting a manner of speech in a traditional public forum.[1] Consequently, as the Court correctly states, the ordinance is subject to the well-settled time, place, and manner test: the restriction must be content and viewpoint neutral,[2] leave open ample alternative channels of communication, and be narrowly tailored to further a substantial governmental interest. *Ante,* at 482; *Perry Education Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 45 (1983).

Assuming one construes the ordinance as the Court does,[3] I agree that the regulation reserves ample alternative channels of communication. *Ante,* at 482–484. I also agree with the Court that the town has a substantial interest in protecting its residents' right to be left alone in their homes. *Ante,* at 484–485; *Carey* v. *Brown,* 447 U. S. 455, 470–471 (1980). It is, however, critical to specify the precise scope of this interest. The mere fact that speech takes place in a residential neighborhood does not automatically implicate a residential privacy interest. It is the intrusion of speech into the

---

[1] The Court today soundly rejects the town's rogue argument that residential streets are something less than public fora. *Ante,* at 479–481. I wholeheartedly agree with this portion of the Court's opinion.

[2] The Court relies on our "two-court rule" to avoid appellees' argument that state law creates a labor picketing exception to the Brookfield ordinance, and thus that the law is not content neutral. *Ante,* at 481–482. However, I would not be as quick to apply the rule here. The District Court's opinion focuses solely on the language and history of the town ordinance and does not refer to state law, 619 F. Supp. 792, 796 (ED Wis. 1985); the panel simply deferred to the District Court; and the en banc court issued no opinion. I cannot find even *one* court, let alone two, that has clearly passed on appellees' argument. Cf. *Virginia* v. *American Booksellers Assn.,* 484 U. S. 383, 395 (1988). However, nothing in the Court's opinion forecloses consideration of this question on remand.

[3] Like JUSTICE WHITE, I am wary of the Court's rather strained "single-residence" construction of the ordinance. Moreover, I give little weight to the town attorney's interpretation of the law; his legal interpretations do not bind the state courts, and therefore they cannot bind us. *American Booksellers, supra,* at 395. However, for purposes of this dissent, I will accept the Court's reading.

home or the unduly coercive nature of a particular manner of speech around the home that is subject to more exacting regulation. Thus, the intrusion into the home of an unwelcome solicitor, *Martin* v. *Struthers*, 319 U. S. 141 (1943), or unwanted mail, *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970), may be forbidden. Similarly, the government may forbid the intrusion of excessive noise into the home, *Kovacs* v. *Cooper*, 336 U. S. 77 (1949), or, in appropriate circumstances, perhaps even radio waves, *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978). Similarly, the government may prohibit unduly coercive conduct around the home, even though it involves expressive elements. A crowd of protesters need not be permitted virtually to imprison a person in his or her own house merely because they shout slogans or carry signs. But so long as the speech remains outside the home and does not unduly coerce the occupant, the government's heightened interest in protecting residential privacy is not implicated. See *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 420 (1971).

The foregoing distinction is crucial here because it directly affects the last prong of the time, place, and manner test: whether the ordinance is narrowly tailored to achieve the governmental interest. I do not quarrel with the Court's reliance on *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984), for the proposition that a blanket prohibition of a manner of speech in particular public fora may nonetheless be "narrowly tailored" if in each case the manner of speech forbidden necessarily produces the very "evil" the government seeks to eradicate. *Ante*, at 485–486; *Vincent*, 466 U. S., at 808; *id.*, at 830 (BRENNAN, J., dissenting). However, the application of this test requires that the government demonstrate that the offending aspects of the prohibited manner of speech cannot be separately, and less intrusively, controlled. Thus here, if the intrusive and unduly coercive elements of residential picketing can be eliminated without simultaneously eliminating residential picket-

ing completely, the Brookfield ordinance fails the *Vincent* test.

Without question there are many aspects of residential picketing that, if unregulated, might easily become intrusive or unduly coercive. Indeed, some of these aspects are illustrated by this very case. As the District Court found, before the ordinance took effect up to 40 sign-carrying, slogan-shouting protesters regularly converged on Dr. Victoria's home and, in addition to protesting, warned young children not to go near the house because Dr. Victoria was a "baby killer." Further, the throng repeatedly trespassed onto the Victorias' property and at least once blocked the exits to their home. 619 F. Supp. 792, 795 (ED Wis. 1985). Surely it is within the government's power to enact regulations as necessary to prevent such intrusive and coercive abuses. Thus, for example, the government could constitutionally regulate the number of residential picketers, the hours during which a residential picket may take place, or the noise level of such a picket. In short, substantial regulation is permitted to neutralize the intrusive or unduly coercive aspects of picketing around the home. But to say that picketing may be substantially regulated is not to say that it may be prohibited in its entirety. Once size, time, volume, and the like have been controlled to ensure that the picket is no longer intrusive or coercive, only the speech itself remains, conveyed perhaps by a lone, silent individual, walking back and forth with a sign. Cf. *NLRB* v. *Retail Store Employees*, 447 U. S. 607, 618 (1980) (STEVENS, J., concurring in part and concurring in result). Such speech, which no longer implicates the heightened governmental interest in residential privacy, is nevertheless banned by the Brookfield law. Therefore, the ordinance is not narrowly tailored.

The Court nonetheless attempts to justify the town's sweeping prohibition. Central to the Court's analysis is the determination that:

"[I]n contrast [to other forms of communication], the picketing [here] is narrowly directed at the household, not the public. The type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy." *Ante,* at 486.

That reasoning is flawed. First, the ordinance applies to all picketers, not just those engaged in the protest giving rise to this challenge. Yet the Court cites no evidence to support its assertion that picketers generally, or even appellees specifically, desire to communicate only with the "targeted resident." (In fact, the District Court, on the basis of an uncontradicted affidavit, found that appellees sought to communicate with *both* Dr. Victoria and with the public. 619 F. Supp., at 795.) While picketers' signs might be seen from the resident's house, they are also visible to passersby. To be sure, the audience is limited to those within sight of the picket, but focusing speech does not strip it of constitutional protection. Even the site-specific aspect of the picket identifies to the public the object of the picketers' attention. Cf. *Boos* v. *Barry,* 485 U. S. 312, 331 (1988). Nor does the picketers' ultimate goal—to influence the resident's conduct—change the analysis; as the Court held in *Keefe, supra,* at 419, such a goal does not defeat First Amendment protection.

A second flaw in the Court's reasoning is that it assumes that the intrusive elements of a residential picket are "inherent." However, in support of this crucial conclusion the Court only briefly examines the effect of a narrowly tailored ordinance: "[E]ven a solitary picket can invade residential privacy. See *Carey, supra,* at 478–479 (REHNQUIST, J., dissenting) ('Whether . . . alone or accompanied by others . . . there are few of us that would feel comfortable knowing that

a stranger lurks outside our home')." *Ante*, at 487 (ellipses in Court's opinion). The Court's reference to the *Carey* dissent, its sole support for this assertion, conjures up images of a "lurking" stranger, secreting himself or herself outside a residence like a thief in the night, threatening physical harm. This hardly seems an apt depiction of a solitary picket, especially at midafternoon, whose presence is objectionable because it is notorious. Contrary to the Court's declaration in this regard, it seems far more likely that a picketer who truly desires only to harass those inside a particular residence will find that goal unachievable in the face of a narrowly tailored ordinance substantially limiting, for example, the size, time, and volume of the protest. If, on the other hand, the picketer intends to communicate generally, a carefully crafted ordinance will allow him or her to do so without intruding upon or unduly harassing the resident. Consequently, the discomfort to which the Court must refer is merely that of knowing there is a person outside who disagrees with someone inside. This may indeed be uncomfortable, but it does not implicate the town's interest in residential privacy and therefore does not warrant silencing speech.

A valid time, place, or manner law neutrally regulates speech only to the extent necessary to achieve a substantial governmental interest, and no further. Because the Court is unwilling to examine the Brookfield ordinance in light of the precise governmental interest at issue, it condones a law that suppresses substantially more speech than is necessary. I dissent.

JUSTICE STEVENS, dissenting.

"GET WELL CHARLIE—OUR TEAM NEEDS YOU."

In Brookfield, Wisconsin, it is unlawful for a fifth grader to carry such a sign in front of a residence for the period of time necessary to convey its friendly message to its intended audience.

The Court's analysis of the question whether Brookfield's ban on picketing is constitutional begins with an acknowledgment that the ordinance "operates at the core of the First Amendment," *ante*, at 479, and that the streets of Brookfield are a "traditional public forum," *ante*, at 480. It concludes, however, that the total ban on residential picketing is "narrowly tailored" to protect "only unwilling recipients of the communications." *Ante*, at 485. The plain language of the ordinance, however, applies to communications to willing and indifferent recipients as well as to the unwilling.

I do not believe we advance the inquiry by rejecting what JUSTICE BRENNAN calls the "rogue argument that residential streets are something less than public fora," *ante*, at 492, n. 1. See *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, 473 U. S. 788, 833 (1985) (STEVENS, J., dissenting). The streets in a residential neighborhood that has no sidewalks are quite obviously a different type of forum than a stadium or a public park. Attaching the label "public forum" to the area in front of a single family dwelling does not help us decide whether the town's interest in the safe and efficient flow of traffic or its interest in protecting the privacy of its citizens justifies denying picketers the right to march up and down the streets at will.

Two characteristics of picketing—and of speech more generally—make this a difficult case. First, it is important to recognize that, "[l]ike so many other kinds of expression, picketing is a mixture of conduct and communication." *NLRB* v. *Retail Store Employees*, 447 U. S. 607, 618–619 (1980) (STEVENS, J., concurring in part and concurring in result). If we put the speech element to one side, I should think it perfectly clear that the town could prohibit pedestrians from loitering in front of a residence. On the other hand, it seems equally clear that a sign carrier has a right to march past a residence—and presumably pause long enough to give the occupants an opportunity to read his or her message—regardless of whether the reader agrees, disagrees, or is sim-

ply indifferent to the point of view being expressed. Second, it bears emphasis that:

> "[A] communication may be offensive in two different ways. Independently of the message the speaker intends to convey, the form of his communication may be offensive—perhaps because it is too loud or too ugly in a particular setting. Other speeches, even though elegantly phrased in dulcet tones, are offensive simply because the listener disagrees with the speaker's message." *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530, 546–547 (STEVENS, J., concurring in judgment) (footnotes omitted).

Picketing is a form of speech that, by virtue of its repetition of message and often hostile presentation, may be disruptive of an environment irrespective of the substantive message conveyed.

The picketing that gave rise to the ordinance enacted in this case was obviously intended to do more than convey a message of opposition to the character of the doctor's practice; it was intended to cause him and his family substantial psychological distress. As the record reveals, the picketers' message was repeatedly redelivered by a relatively large group—in essence, increasing the volume and intrusiveness of the same message with each repeated assertion, cf. *Kovacs* v. *Cooper*, 336 U. S. 77 (1949). As is often the function of picketing, during the periods of protest the doctor's home was held under a virtual siege. I do not believe that picketing for the sole purpose of imposing psychological harm on a family in the shelter of their home is constitutionally protected. I do believe, however, that the picketers have a right to communicate their strong opposition to abortion to the doctor, but after they have had a fair opportunity to communicate that message, I see little justification for allowing them to remain in front of his home and repeat it over and over again simply to harm the doctor and his family. Thus, I

agree that the ordinance may be constitutionally applied to the kind of picketing that gave rise to its enactment.

On the other hand, the ordinance is unquestionably "overbroad" in that it prohibits some communication that is protected by the First Amendment. The question, then, is whether to apply the overbreadth doctrine's "strong medicine," see *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973), or to put that approach aside "and await further developments," see *ante*, at 491 (WHITE, J., concurring in judgment). In *Broadrick*, the Court framed the inquiry thusly:

> "To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." 413 U. S., at 615.

In this case the overbreadth is unquestionably "real." Whether or not it is "substantial" in relation to the "plainly legitimate sweep" of the ordinance is a more difficult question. My hunch is that the town will probably not enforce its ban against friendly, innocuous, or even brief unfriendly picketing, and that the Court may be right in concluding that its legitimate sweep makes its overbreadth insubstantial. But there are two countervailing considerations that are persuasive to me. The scope of the ordinance gives the town officials far too much discretion in making enforcement decisions; while we sit by and await further developments, potential picketers must act at their peril. Second, it is a simple matter for the town to amend its ordinance and to limit the ban to conduct that unreasonably interferes with the privacy of the home and does not serve a reasonable communicative purpose. Accordingly, I respectfully dissent.