### The FIDELITY & CASUALTY COMPANY OF NEW YORK, Plaintiff–Appellee,

v.

### TILLMAN CORPORATION, Defendant–Appellant.

### No. 96–3216.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1997.

Decided April 24, 1997.

Michael P. Blaize (argued), Hoeppner, Wagner & Evans, Valparaiso, IN, for Plaintiff-Appellee.

Andrew E. Skopp, Mark P. Miller (argued), Lauren S. Tashma, Wildman, Harrold, Allen & Dixon, Chicago, IL, and Joseph Stalmack, Galvin, Stalmack & Kirschner, Hammond, IN, for Defendant-Appellant.

Before BAUER, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

When at the close of 1990 Jack Hubbard created Tillman Corporation to enter the construction business, he asked Elmer Layden to secure the necessary insurance. Through his insurance brokerage (Elmer Layden, Inc.) Layden obtained several liability policies for Tillman, but workers' compensation coverage was hard to come by. Layden submitted an application on Tillman's behalf to the Indiana Compensation Rating Bureau, which manages that state's assigned-risk pool. Tillman estimated that its payroll for 1991 would be $150,000, which under the state's rules required an advance payment of $3,303 for the year's coverage; the rules provided for an audit at year's end to determine the actual payroll, and thus the final premium. The Bureau assigned the risk to The Fidelity & Casualty Company of New York and issued a 30-day binder; within this month Fidelity issued an appropriate policy. Layden sent Tillman forms for computing how much the workers' compensation policy would cost. These came in handy, because Tillman's payroll exceeded $6 million through the end of its fiscal year on September 30, 1991. But instead of computing how much it would owe in October and establishing a reserve, as it should have done, Tillman remitted some $187,000 to Layden, who stole all but $10,000 of this money. Today Layden is insolvent and imprisoned, and we must

decide who bears the loss. Tillman argues that Layden was Fidelity's agent; Fidelity argues that he was Tillman's. A magistrate judge, who heard the case by consent under 28 U.S.C. § 636(c), granted summary judgment in favor of Fidelity and ordered Tillman to pay Fidelity some $130,000 (the balance of the correct premium), plus interest, for workers' compensation coverage between January and September 1991.

■ Tillman believes that Fidelity should have named Layden as a defendant, a step that would have precluded federal jurisdiction by spoiling complete diversity of citizenship. The magistrate judge correctly concluded that Layden is not an indispensable party. According to Fed.R.Civ.P. 19(a), a person should be joined as a party if "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Complete relief is possible between Tillman and Fidelity without Layden's presence. Tillman's argument proceeds along the lines of Rule 19(a)(2)(ii): it fears losing in the federal suit on the ground that Layden was its agent, and then in a state suit against Layden if the state court should conclude that Layden was Fidelity's agent. That sequence is unlikely: Layden lacks the assets to pay a judgment and is not apt to acquire them later (his expertise in the insurance business has been rendered worthless by the nature of his crime), so as a practical matter no one is going to sue him. Layden owes either Fidelity or Tillman; the problem is not that he asserts a legal right to keep the money, but that he does not have the money. If Fidelity prevails in this case, and Layden miraculously becomes solvent yet perversely pays Fidelity, then Fidelity will have an obligation under the law of restitution to relay that second payment to Tillman. Rule 19(b) provides the court with discretion to proceed without Layden, given that his presence would destroy federal jurisdiction. *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 122, 88 S.Ct. 733, 744–45, 19 L.Ed.2d 936 (1968). This is an appropriate case in which to exercise that power and get on with decision between the two real contestants.

■ Tillman's argument on the merits is straightforward. Indiana has a simple rule. An intermediary in the insurance business is the agent of the insured while shopping for a policy, and the agent of the insurer after a policy issues. See *Benante v. United Pacific Life Insurance Co.,* 659 N.E.2d 545, 547 (Ind. 1995); *Aetna Insurance Co. v. Rodriguez,* 517 N.E.2d 386 (Ind.1988); *Stockberger v. Meridian Mutual Insurance Co.,* 182 Ind. App. 566, 395 N.E.2d 1272, 1278–79 (1979). Tillman remitted premiums to Layden after Fidelity issued its policy; therefore, Tillman concludes, Layden received the money as Fidelity's agent, and the loss from Layden's dishonesty falls on Fidelity. The problem with this approach, however, is that Indiana's cases all arise from situations in which the intermediary applied for a policy, which the insurer agreed to issue. Fidelity did not agree to any proposal from Layden—and Indiana's rule does not cover strangers to whom insureds choose to remit money. Suppose that, after Fidelity issued its policy, Tillman had sent $187,000 to John Gotti, who stole the cash. Surely Tillman could not say that its decision to pay Gotti made Gotti Fidelity's agent. Agency is a voluntary relation. Indiana's rationale for treating intermediaries as agents of the insurers is that the insurers can decide with whom to deal. Carriers may demand that would-be agents establish their trustworthiness, and may set conditions—fidelity bonds, audits of the books, compensation for risk bearing—to protect themselves. Insurers are best situated to monitor intermediaries through which they choose to deal, and therefore bear the risk of loss.

Insurers cannot do any of these things for workers' compensation policies placed through Indiana's assigned-risk pool. Indiana calls an intermediary through which an employer approaches the Bureau a "pro-

ducer", to distinguish this intermediary from an agent. According to the *Indiana Workers Compensation Insurance Plan: Information and Procedures* (Indiana Compensation Rating Bureau 1989–92), a "producer is the licensed Indiana agent who may assist the employer in making application to the Plan and in continuing coverage under the Plan in accordance with the rules and procedures." An employer or its chosen producer submits an application to the Plan, after which the Bureau, not the producer, selects a carrier to bear the risk. The selected carrier *must* insure the employer unless it can persuade the Bureau that the employer "knowingly refuses to meet reasonable health and safety requirements." "All risks assigned under this Plan shall be written at the classifications and rates established by the Indiana Compensation Rating Bureau." So the insurer cannot choose its customers or set its rates; what is more, because the employer selects the producer, the carrier has no control over the producer's identity and practices. It cannot refuse to deal with producers that lack fidelity bonds and do not hold premiums in escrow accounts, to name only two obvious precautions. A carrier's lack of any influence over the identity and practices of the producer has another consequence, hinted at in the passage above defining the producer as an "agent who may assist the employer" and made explicit in an emphasized passage of the Bureau's publication:

> Important note to the producer: Remember, although you have an important role under the Plan, you are not a contract agent or agency of the servicing carrier. You have no authority from the servicing carrier to bind or cancel coverage or to otherwise act within such agency relationship. Unless a legal finance agreement exists which assigns cancellation or premium refund collection rights to a third party, all premium transactions are strictly between the servicing carrier and the employer as a policyholder and you are not a party to that contract. A servicing carrier may give you certain authority, such as permission to issue certificates of insurance, but such rights are not to be routinely assumed by a producer.

Fidelity issued its policy directly to Tillman, so as servicing carrier it did not give Layden the type of authority to which the final sentence refers. Fidelity did not select or approve Layden for any other purpose, either; it never voluntarily issued any policy through his firm.

No case decided by an Indiana court holds, or even hints, that a "producer" in an assigned-risk situation is the carrier's agent for the purpose of receiving premiums—something the producer is not supposed to do at all. Only one case in any other state addresses the question. Louisiana treats the intermediary as the insurer's agent, although under a system so different from Indiana's that the decision is not illuminating. *DeSoto Parish School Board v. Insurance Co. of North America*, 572 So.2d 310 (La.App.1990). Given the silence of Indiana's judiciary, the most authoritative word we have on the subject is the Bureau's publication, which proclaims that the producer is the employer's agent—for only the employer has any power to select or monitor the producer. We are exceptionally reluctant to go against this administrative understanding of Indiana law. A federal court dealing with a federal agency would respect the agency's view under the Chevron doctrine; at least that degree of respect is appropriate when principles of federalism are in play. See *Arizonans for Official English v. Arizona*, — U.S. —, —, 117 S.Ct. 1055, 1073, 137 L.Ed.2d 170 (1997); *Frisby v. Schultz*, 487 U.S. 474, 482, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988); *Eakin v. Continental Illinois National Bank*, 875 F.2d 114, 117 (7th Cir.1989). This is not at all to say that the Bureau's publication is a rule with the force of law; it is only to say that it reflects a view that a federal court should respect.

Although we are confident that Indiana would not treat "producers" in the workers' compensation assigned-risk pool as automatic agents of the selected carriers, the possibility remains that Fidelity might have made Layden its agent for this particular transaction. Tillman observes that Indiana uses a multifactor balancing approach for the ordinary determination of agency, *Benante*, 659 N.E.2d at 548, which it invokes to support a fallback position that it is entitled to a trial.

Exhibit One in Tillman's list of important facts is that Fidelity paid Layden a commission. Yet this hardly shows that Fidelity made Layden its agent; Fidelity was legally required to pay the producer. Here is what the Bureau's publication says: "The carrier shall pay a fee to the producer designated by the employer on new and renewal policies.... The fee shall be based upon the state standard premium and paid at the rate of eight percent on the first one thousand dollars of premium, five percent upon the next four thousand dollars of premium, three percent on the next ninety-five thousand dollars of premium and two percent on premium in excess of one hundred thousand dollars." A carrier's compliance with this obligation—articulated in the same publication that declares the producer an agent of the employer—cannot logically adopt the producer as the carrier's agent. Payment is involuntary. Exhibit Two is slightly more suggestive. Tillman says that Layden sent it worksheets for calculating premiums, and that these worksheets bore the name "Fidelity." Where did they come from, except from Fidelity, Tillman wonders, and how could Layden have obtained them without being Fidelity's agent? Fidelity denies that it furnished worksheets to Layden, but let us suppose that Tillman could prove that it did. How could this support an inference of agency? Worksheets help the employer to calculate its obligation, but they do not invite immediate payment through the producer. Both the Bureau's publication and the policy call for payment to the carrier at the end of the year. A carrier may provide documents for its insured without appointing as its agents all those through whose hands the documents pass. Remember that the question in this case is whether Fidelity made Layden its agent *for the purpose of receiving premiums.* Nothing in the worksheets would imply to a reasonable reader that premiums were due before the end of the fiscal year, let alone that Fidelity had agreed to accept payment through Layden.

Whether Fidelity supplied worksheets bearing its name to Layden is the only disputed issue of fact, and we do not think the dispute legally material. Other propositions of fact, undisputed on this record, are similarly unhelpful to Tillman. Tillman sent checks to Layden; Layden told Tillman that he was accepting the money on Fidelity's behalf; Layden told Fidelity that Tillman's big construction project was winding down, so it was time for an audit. Layden cannot appoint himself as Fidelity's agent; only what Fidelity did matters. It issued the policy and paid the claims made by Tillman's workers; both of these steps were legally required by Indiana law and did not make Layden its agent for purposes of receiving premiums. There are no material disputed issues, nothing to undercut the undisputed facts that Fidelity did not choose Layden, could not have rejected Layden, and did not instruct Tillman to remit premiums to Layden. Tillman brought this problem on itself by unnecessarily sending large sums of money to a crook. It must bear the loss.

AFFIRMED.