

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00222-CR

JOEY DARRELL FAUST                                      APPELLANT

V.

THE STATE OF TEXAS                                          STATE

### NO. 02-13-00223-CR

RAMON MARROQUIN                                        APPELLANT

V.

THE STATE OF TEXAS                                          STATE

----------

## FROM COUNTY CRIMINAL COURT NO. 2 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

[1]*See* Tex. R. App. P. 47.4.

Appellants Joey Darrell Faust and Ramon Marroquin were found guilty of interfering with public duties, for which the trial court set punishment at a $286 fine and two days' confinement in the Tarrant County Jail. *See* Tex. Penal Code Ann. § 38.15(a)(1) (West 2011). We reverse.

**Background Facts**

Appellants are members of the Kingdom Baptist Church. On October 6, 2012, a gay pride parade was held in downtown Fort Worth. Faust, Marroquin, and other church members went to protest the parade. The Fort Worth Police Department had teams of police officers from the Zero Tolerance Unit along the parade route to control the crowd and act "as a tactical response" to any physical altercations that might occur. The teams were apprised of a history of Kingdom Baptist members being involved in physical altercations at previous parades.

Team Five, led by Sergeant Paul Genualdo, was positioned at the intersection of Main and Second Street. Before the parade began, Genualdo approached Faust and the Kingdom Baptist group and asked if the group would move and join another protesting group so that the protestors would be in one area. Faust declined. Genualdo left and moved his team to Main and Third Street.

After the official parade ended, some members of the public continued walking down the parade route. Two of the Zero Tolerance teams, Team Five and Team One, led by Sergeant Rachel DeHoyos, formed a line in the street blocking traffic on Main Street to maintain space between the parade and the

2

protestors "to further prevent any confrontation." Genualdo testified that the protestors would be allowed to continue down Main Street "once [the unit] determined there was a safe-time distance between the two [groups]." Other members of the public were allowed to cross the police line.

Faust approached the police line, and Genualdo told him he could not go down Main Street. Faust told Genualdo that he "didn't agree with that," and asked if he was being detained. Genualdo told him no, that "he could go any other direction, east, west[,] or north, but he wasn't going southbound at that time." Faust told Genualdo that he "was working for a lesbian, . . . that [he] needed to put earrings and a bow in [his] hair, and . . . referred to [him] as a fag." Despite Genualdo's warnings that he was not allowed to cross, Faust crossed the police line. Genualdo arrested Faust. Around the same time, Marroquin attempted to push through the line of officers, and he was also arrested.

Faust and Marroquin were both charged with interference with public duties. *See id.* (making it an offense if a "person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty"). Both pleaded not guilty. After a bench trial, the court found both Faust and Marroquin guilty and set punishment at a $286 fine and two days' confinement in the Tarrant County Jail. They appealed.[2]

---

[2]The cases were consolidated for purposes of this appeal.

3

**Discussion**

In their sole issue, Appellants argue that they were detained based on speculation of the content of their future speech in violation of their First Amendment rights and therefore penal code section 38.15(a)(1) is unconstitutional as applied to them.

We first address the State's argument that Appellants' First Amendment rights are not implicated in this case because they were arrested for interfering with a peace officer, not for their speech. Genualdo testified that when the Zero Tolerance teams formed the skirmish line, they told the individuals, whom they had previously identified as members of the Kingdom Baptist Church, that they were not allowed to cross. Police officers specifically targeted the church group because of their previous history with violence resulting from their vehement rhetoric against homosexuality. Genualdo testified that other people were permitted to cross through the skirmish line "[b]ecause they were not members of that church [and] they were not members of the group that were historically causing problems." DeHoyos also testified that other members of the public were allowed to pass through the street "[b]ecause they were not part of the Kingdom Baptist Church." In short, the only people who would be arrested for crossing the skirmish line were the church members because they were the only people who were told they could not cross. And the only reason they were told they could not cross was because of the group's history of inciting violence, not for their current actions. Peaceful and orderly demonstrations "in public places,

4

particularly streets, sidewalks, and parks, are extended [F]irst [A]mendment protection." *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 205 (Tex. 1981). By targeting the Kingdom Baptist Church members for restraint based solely on their history of violence induced by their abusive speech, the police officers necessarily implicated the group's First Amendment rights.

The prohibition against crossing the skirmish line "must be judged against the stringent standards we have established for restrictions on speech in traditional public fora." *Frisby v. Schultz*, 487 U.S. 474, 481, 108 S. Ct. 2495, 2500 (1988). The United States Supreme Court has explained,

> For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . . The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 955 (1983) (citations omitted). Regulations restricting speech are content-neutral when they are directed to the secondary effects of a speaker's conduct as opposed to the content of the speech itself. *City of Renton v. Playtime Theatres*, 475 U.S. 41, 47–48, 106 S. Ct. 925, 929 (1986). Genualdo testified that the purpose of controlling the church group was "[t]o prevent a breach of the peace, basically. We were trying to make sure that there were no physical altercations that took place." He stated that the police's concern over the church group was

5

not that they would express their religious beliefs but that they would use profanity. DeHoyos testified that the police's concern was

> that if they were to pass with the parade-goers as they did last year, that we would have altercations. Not necessarily them engaging in altercations, but I didn't know that the people attending the parade might not lash out at them, so I felt the duty to protect not only the parade-goers, but the protestors themselves.

Because the skirmish line was directed at the possible secondary effects of the church group's speech, we look to whether the skirmish line was narrowly tailored to serve a significant government interest. *See Perry*, 460 U.S. at 45, 103 S. Ct. at 955.

There is no doubt that maintaining peace and public safety is a significant government interest. *See Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 376, 117 S. Ct. 855, 866 (1997) (noting that the government has a significant interest in public safety); *Momentoff v. State*, No. 02-12-00335-CR, 2013 WL 5967107 at *6 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (mem. op., not designated for publication) (noting the State's "strong interest in ensuring the public safety and order") (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768, 114 S. Ct. 2516, 2526 (1994)). A regulation is narrowly tailored to serve such an interest "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485, 108 S. Ct at 2503 (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808–810, 104 S. Ct. 2118, 2130–2132 (1984)). "A complete ban can be narrowly

6

tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Id.*

The skirmish line at issue here was not narrowly tailored to serve the government's interest in public safety. All members of the church were barred from proceeding down the street regardless of whether they had previously assaulted parade-goers or not, whether they were yelling profanity or threatening words or not, or whether they were even protesting at all. Although there was evidence that the police department had received complaints about the church's "street preaching" many times in the past, the only evidence the church had ever reached beyond the boundaries of protected speech was that one of their members, Chad Sutherland, had assaulted a parade participant at the 2011 parade. There was no evidence that Sutherland was with the church members at the 2012 parade, that any of the members present at the 2012 parade were involved with the 2011 assault, or that any of the members present were threatening any parade-goers with imminent physical injury. *See Madsen*, 512 U.S. at 774, 114 S. Ct. at 2529 ("Absent evidence that the protesters' speech is independently proscribable (*i.e.,* "fighting words" or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, this provision cannot stand." (citations omitted)).

DeHoyos testified that both appellants had been at the 2011 parade but had not assaulted anyone. She testified that during the parade, police had asked the church group to move down the street and that they had said, "thank you,

7

but, no, we will not move there." She saw the church members expressing their views during the parade "in various places." The police officers described the church members' speech as abusive but stated that their threats were limited to "rebuking people for being gay or having gay family and that they were going to go to hell or burn in hell if they didn't repent their sins."

The skirmish line prohibited all members of the church from exercising their right of free speech merely because of their association with the church. This is far too broad a limitation. *See Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S. Ct. 2746, 2758 (1989) (stating that if "a substantial portion of the burden on speech does not serve to advance" the ordinance's stated goals, then the ordinance is not narrowly tailored); *Justice For All v. Faulkner*, 410 F.3d 760, 770 (5th Cir. 2005) ("The 'narrow tailoring' inquiry, however, asks whether that particular method burdens substantially more speech than is necessary."). Although we do not believe that the police were required to wait until violence erupted before they stepped in, we do believe there must have been some indication that the public's safety was at risk beyond the history of one assault by a member of the organization who may not even have been present at the time the skirmish line was in place. *See Boos v. Barry,* 485 U.S. 312, 322, 108 S. Ct. 1157, 1164 (1988) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate 'breathing space' to the freedoms protected by the First Amendment.'") (quoting *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56, 108

8

S.Ct. 876, 882 (1988)).  Because the skirmish line was not narrowly tailored, it was an unconstitutional infringement upon Appellants' right of free speech.  We sustain their issue on appeal.

## Conclusion

Having sustained Appellants' issue, we reverse the trial court's judgment and render a judgment of acquittal.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 12, 2014