OPINION.
In this case, we are confronted with the issue of just how far the First Amendment protects sexually inappropriate comments to the opposite sex, and under what circumstances a person's refusal to desist, when he knows his comments are offensive to the listener, crosses the line between protected speech and disorderly conduct under R.C. 2917.11(A)(5). The twenty-nine-year-old defendant-appellant, Brian Bailey, argues that his admittedly "dumb" sexually-oriented comments to a female teenager, even after she had asked him to leave her alone, were protected free speech under the First Amendment, and that his physical conduct following her around a public fitness complex in order to make such comments, — was too innocuous to rise to the level of criminal conduct. We disagree and thus affirm.
The Prosecution's Case
Lauren Wulker was at the Mercy HealthPlex in Anderson Township on January 25, 2001, between seven and eight o'clock at night, with her mother, Janie. At the time, Lauren was sixteen years old, wearing a McNicholas High School sweatshirt with her last name on it. While her mother worked out in the gym, Lauren went to the track. After Lauren began stretching before running, Bailey, an unmarried stockbroker, approached her and struck up a conversation about her participation in high-school soccer. Bailey then ran a lap or two while Lauren continued to stretch. When he was through, Bailey approached her again and asked if she could "do the splits."
Lauren testified that the question caught her off guard. Instead of answering the question directly, she left to go run laps. As she ran, Lauren noticed that Bailey, who was sitting on a bench, "watched me from one end of the track to the other." After running, she stopped to cool off. Bailey approached her again and challenged her to a race. She testified that she then jogged to the other end of the track to get away from him, and that Bailey ran after her and continued to try to make conversation. It was at that point, Lauren testified, that she turned her back to him and told him to get away from her.
Bailey, however, did not leave her alone. Rather, according to Lauren, he asked her if she had a boyfriend, what his name was, and if he ever pressured her into doing things "like doing it." Lauren testified, "I just said, no, you know, and just kind of tried to walk away again. His response was, `Oh, that's because you're a good little girl, and mom raised you good.' And then he said, `You know, you're just a little puppy dog. What are you, sixteen?' And then he said, `Well, you know, in my eyes, girls mature a lot faster than guys, so you're really eighteen or nineteen.'"
Lauren responded to this harangue by once again asking Bailey to leave her alone. She testified that she again attempted to walk away, but that Bailey followed, continuing to ask her uninvited personal questions. As she was walking, Bailey repeated her name and the name of her school, and then told her that he was going to "look for her" in the news and "watch for [her] at school." Lauren testified that by this point she had become "scared." In her words, "I didn't expect a 28- or 29-year-old man to approach me and ask me sexually inappropriate questions." She described feeling "violated," "alarmed," and "confused." She also testified that Bailey's behavior made her feel "paranoid" because she interpreted his words to mean that Bailey would come looking for her at school.
Lauren testified that she then left the track area to join her mother in the weight room. She testified that Bailey also went into the weight room, and that every time she went to a different weight machine, "I could see him looking at me." She stated, "I could see him, like, following — like not so much as like right behind me, but just like inching his way closer to what machine I was on."
At that point, after consulting with a friend, Lauren told her mother about Bailey's behavior, and that she was scared and wanted to leave. Janie Wulker described Lauren as "shaking" and on "the verge of tears." After speaking to several employees of the HealthPlex, Janie then confronted Bailey on the stairwell, grabbing him by the arm. According to Janie, Bailey told her that he was just "playing" with Lauren, and then he accused her, Janie, of being "crazy," "sick," and a "lesbian." Janie responded by telling Bailey that he was the one who was sick, and she then reported the incident to the authorities.
Bailey's Disavowal
Testifying in his defense, Bailey admitted asking Lauren if she could "do the splits," but described it as a mutual "challenge" while they were talking and stretching together. He denied that the question appeared to upset her and described their conversation, throughout the evening, as consisting of "general flirtations." Indeed, on cross-examination, Bailey testified that, in his view, Lauren was flirting with him. He denied ever knowing Lauren's age. Asked about his alleged statement that he would be looking for Lauren in the news and at school, he testified that he meant that he would try to follow her athletic career in the newspaper. He denied that Lauren ever asked her to leave, and he described her attitude toward him as "respectful." He denied following her or asking her if she had a boyfriend. According to Bailey, he went into the weight room before Lauren and did not take notice of her, or do anything to her, after she started working out on the machines. He testified that Janie grabbed his arm on the stairwell, accusing him of being a "pervert." He admitted that he called her "crazy," but he denied calling her a lesbian.
The Complaint and the Conviction
Janie Wulker filed a complaint against Bailey in the Hamilton County Municipal Court, alleging that he had caused alarm to another by creating a condition that was "physically offensive * * * by an act that served no purpose." Her affidavit accompanying the complaint alleged that Bailey had "accosted" her daughter and "followed [her] throughout the HealthPlex after being told to leave her alone." The complaint also asserted that Bailey had made "sexually inappropriate * * * verbal remarks" and had stated that he would be "looking for her" on the news and at her high school.
A trial was held to the bench. At the conclusion of the evidence, Bailey renewed a motion for acquittal under Crim.R. 29. The trial court found Bailey guilty of disorderly conduct in violation of R.C. 2917.11, without specifying in its journal the particular subsection that it had found to be applicable. From the bench, however, the trial court indicated that it had found Bailey guilty under both subsections (A)(2) and (A)(5). Those subsections, respectively, prohibit a person from causing inconvenience, annoyance, or alarm by "offensively coarse utterances" or "unwarranted or grossly abusive language," or by creating a "condition that is physically offensive to persons * * * by an act that serves no lawful or reasonable purpose of the offender."
Discussion
In his first assignment of error, Bailey argues that the trial court erred by denying his motion for acquittal. Review of the denial of his motion requires us to construe the evidence in the light most favorable to the prosecution. See State v. Wolf (1988), 51 Ohio App.3d 215,555 N.E.2d 689. For the purposes of our analysis, therefore, we must accept the version of events proffered by Lauren and Janie Wulker. In other words, we must assume that Bailey said all the sexually inappropriate things that he was alleged to have said; that he was twice asked by Lauren to leave her alone and did not do so; that he knew she was in high school; that he made a veiled threat to watch for her at school; that his conversation alarmed, confused and scared Lauren; that he followed Lauren into the weight room and continued to act in a predatory fashion; and that, when confronted by Lauren's outraged mother, he reacted by calling her "sick," "crazy," and a "lesbian."
Bailey argues that even if it is accepted that he did all these things, he could still not have been convicted of disorderly conduct as a matter of law. Initially, he asserts that he could not have been convicted under R.C. 2917.11(A)(2) since his conversation with Lauren was protected free speech.
As a matter of clarification, the complaint and affidavit in this case clearly alleged a violation of R.C. 2917.11(A)(5), not 2917.11(A)(2). A violation of subsection (A)(5) is based upon a person causing annoyance or alarm to another by creating a "condition that is physically offensive to persons * * * by an act that serves no lawful or reasonable purpose of the offender." Admittedly, the trial court found that Bailey could also have been guilty under subsection (A)(2), by causing Lauren alarm or annoyance by "offensively coarse utterances" or "unwarranted or grossly abusive language," but this finding was unnecessary in light of its finding of guilt under subsection (A)(5).
Confining our analysis to the adequacy of the evidence under subsection (A)(5), therefore, we observe initially that the behavior forming the basis of the complaint did not involve pure speech. Bailey was charged not only with making sexually inappropriate comments to Lauren, but, as stated by the charging affidavit, with following her throughout the health complex and continuing to make such inappropriate remarks after he had been twice asked to leave her alone. The behavior the state sought to punish, therefore, had a combination of both speech and conduct. Under subsection (A)(5), as opposed to subsection (A)(2), the issue was not the content of Bailey's speech, but whether Bailey, by saying and doing the things he did, created a "condition" that was "physically offensive" toward Lauren, that caused her alarm and annoyance, and for which there was no legal or reasonable purpose.
Bailey, no doubt reacting to the trial court's finding of guilt under subsection (A)(2), would have us view this case as one turning solely on the content of what he said to Lauren. Again, we do not accept this pure-speech characterization of the case against him. But, because what Bailey said to Lauren was certainly an important component of the behavior that resulted in his conviction, we must address whether the type of conversation in which he engaged is protected under the First Amendment.
The Ohio Supreme Court has held that a person may not be found guilty of disorderly conduct under subsection (A)(2), which proscribes "offensively coarse utterances" and "grossly abusive language," unless the words spoken are "fighting words." See State v. Hoffman (1979),57 Ohio St.2d 129, 387 N.E.2d 239, paragraph one of the syllabus; Statev. Patterson (Nov. 14, 1990), 1st Dist. Nos. C-890598, C-890599, and C-890600. "Fighting words" are not, however, only words of a combative or profane nature spoken in anger. Rather, "fighting words" are words that "by their very utterance inflict injury or are like to provoke the average person to an immediate retaliatory breach of the peace."Cincinnati v. Karlan (1974), 39 Ohio St.2d 107, 109-110, 314 N.E.2d 162, citing Chaplinksy v. New Hampshire (1942), 315 U.S. 568, 62 S.Ct. 766.
When speech falls into the category of "fighting words," the government may regulate it, so long as the regulation is not impermissibly content-based. In other words, a statute may not single out a certain type of "fighting words" for punishment based upon hostility to their particular content.
 The exclusion of "fighting words" from the scope of the First Amendment simply means that, for purposes of that Amendment, the unprotected features of the words are, despite their verbal character, essentially a "nonspeech" element of communication. Fighting words are thus analogous to a noisy sound truck: Each is, as Justice Frankfurther recognized, a "mode of speech," Niemotko v. Maryland, 340 U.S. 268, 282, 71 S.Ct. 325, 333, 95 L.Ed. 267 (1951) (opinion concurring in result); both can be used to convey an idea; but neither has, in and of itself, a claim upon the First Amendment. As with the sound truck, however, so also with fight words: The government may not regulate use based on hostility — or favoritism — toward the underlying message expressed. Compare Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (upholding, against facial challenge, a content-neutral ban on targeted residential picketing), with Carrey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263
(1980) (invalidating a ban on residential picketing that exempted labor picketing).
R.A.V. v. City of St. Paul, Minnesota (1992), 505 U.S. 377, 388,112 S.Ct. 2538.
 The question arises, therefore, whether sexually inappropriate language directed toward another can ever be considered "fighting words." The general answer is "that it cannot." Uninvited sexual overtures, even "dumb" ones, are ordinarily not punishable as anything more than a display of bad manners. As the Ohio Supreme Court has noted, where the person subjected to such sexual advances is free to leave, the Constitution requires the displeased listener to "avoid further bombardment of their sensibilities" by walking away from the speaker. State v. Phipps (1979), 58 Ohio St.2d 271, 278, 389 N.E.2d 1128, citing Cohen v. California (1971), 403 U.S. 15, 21-22, 91 S.Ct. 1780. The constitutional right of free speech is considered paramount to the listener's privacy interest. Id. Thus, "just asking" is ordinarily not a criminal offense.
That is not to say, however, that the First Amendment protects all forms of sexual advances. While "just asking" is generally not a crime, "just asking for sex" may be. Ohio law makes it illegal, for example, for a person over the age of eighteen to solicit a person under the age of thirteen to engage in sexual activity, or for a person over the age of eighteen to solicit a person who is four years younger and under the age of fifteen to engage in sexual conduct. R.C. 2907.07(A) and (C). Sexual solicitation among older teenagers and adults may also fall outside the First Amendment. In Phipps, the Ohio Supreme Court upheld the state's former importuning statute, R.C.2907.07(B), which punished a person for soliciting another person of the same sex when the person knew or recklessly disregarded the fact that such solicitation might offend the other person. The court reasoned that such solicitation constituted "fighting words" due to its potential to incite a violent reaction. Id. at 278, 389 N.E.2d 1128 (emphasis in original). The Phipps court also observed that same-sex sexual solicitations could be considered "fighting words" because of their potential to inflict emotional injury.
 [W]e feel that solicitations of the type proscribed by the [importuning] statute are often "grossly offensive and emotionally disturbing." They are very likely to cause injury in a very real, if only emotional sense. Many times the shock to one's sensibilities and the sense of affront, resulting in injury to one's mind and spirit, are as great from such speech as from a physical assault.
Id. at 279-280, 389 N.E.2d 1128.
 Bailey's sexually inappropriate remarks were admittedly not made toward a member of the same sex, and much of the analysis of Phipps is, at least implicitly, a reaction to homosexual behavior. But, in Cleveland v. Maistros (2001), 145 Ohio App.3d 346, 762 N.E.2d 1065, the Eighth District Court of Appeals struck down the same-sex section of the importuning statute, R.C. 2907.07(B), on equal-protection grounds, reasoning that the same offensive sexual solicitation among heterosexuals constituted disorderly conduct under R.C. 2817.11(A)(5) and was thus subjected to a lesser penalty. Almost twenty-five years before Maistros, this court employed a slightly different equal-protection analysis to strike down the importuning statute, holding that there was no rational basis for limiting punishment of offensive sexual solicitations to members of the same sex. State v. Faulk (Sept. 13, 1978), 1st Dist. No. C-77486.
Our decision in Faulk was subsequently reversed by the Ohio Supreme Court without opinion on the basis of Phipps. State v. Faulk (June 6, 1979), Ohio S.Ct. No. 78-1443. Our analysis was recently vindicated, however, when the Ohio Supreme Court struck down R.C. 2907.07(B) on equal-protection grounds, because limitation of the statute to same-sex solicitation, even if viewed as "fighting words," had the effect of restricting a certain type of speech solely on the basis of content.State v. Thompson, 95 Ohio St.3d 264, 2002-Ohio-2124, ___ N.E.2d ___, at ¶ 12. Significantly, the court in Thompson made clear that its purpose was not to revisit its determination in Phipps that offensive sexual solicitations could fall into the category of "fighting words." Id.
In sum, the First Amendment generally protects the expressions of emotions, including amorous or even lecherous ones, permitting a person to engage in flirtation, even when the object of that flirtation is in no way receptive. But the First Amendment does not protect all forms of sexual solicitation, particularly those involving underage persons. And even among teenagers and adults, certain offensive forms of sexual solicitation may cross over into the area of "fighting words" when they have the potential to cause emotional injury or provoke a violent reaction. When the speaker knowingly or recklessly subjects a person to such solicitation, the state may punish such behavior provided that the government focuses on the injurious or provocative nature of the solicitation and its capacity to inflict injury and incite violence, and not the content of the words spoken or the sexual orientation of the speaker.
Therefore, even if Bailey had been charged and convicted solely under R.C. 2907.11(A)(2), it is possible that his words, if construed as sexual solicitation, may have satisfied the definition of "fighting words." Provided that Bailey said what Lauren said he did, under the circumstances that she described, there was certainly a basis upon which the trial court could have reasonably found that his speech had the capacity to inflict emotional injury or to cite a violent reaction, and that Bailey either knew or should have known this.
Again, however, we stress that Bailey was not charged under R.C.2907.11(A)(2). Rather, Bailey was charged under subsection (A)(5). Although a conviction under subsection (A)(2) is based entirely on the offender's "offensively coarse" or "grossly abusive" speech, a conviction under subsection (A)(5) is based upon the offender's conduct in creating a "condition" that is "physically offensive" toward another person.
We turn, therefore, to an analysis of Bailey's behavior as a whole. Essentially, Bailey, an adult male, approached a teenage girl and caused her severe emotional distress by saying and doing things that made her feel "violated" and "paranoid" and "confused" and "scared," refusing to leave her alone when asked to do so. In addition to his sexually inappropriate comments, Bailey said things that caused Lauren to feel that he was threatening to "watch over her," even at her school. Rather than allowing Lauren to walk away from such disturbing comments, Bailey followed Lauren around the track in order to continue bothering her, and then followed her into the weight room, where he spied upon her and "inched" closer to the machines she was using. Finally, Lauren became so disturbed by Bailey's behavior that she was compelled to seek the protection of her mother in order to put a stop to it.
An important aspect of this case that cannot be ignored is that Bailey's behavior was directed toward a sixteen-year-old female. As a sixteen-year-old, Lauren was still a "juvenile" and a "minor" according to the chapter of the Ohio Revised Code setting forth sex offenses. R.C.2907.01(I) and (M). Perhaps an adult female, or even an older teenager, may not have been so alarmed by Bailey's sexually inappropriate remarks and his refusal to leave her alone. Lauren clearly was.
Bailey, significantly, was given adequate notice that his advances disturbed Lauren. According to Lauren, she twice walked away from Bailey, each time turning her back to him and asking him to leave her alone. Janie described her daughter on "the verge of tears." At some point, Bailey, who had singled out a sixteen year-old girl to be the object of his attention, had to have been aware that he was scaring her. In order to avoid the possibility of someone mistakenly committing the crime of disorderly conduct, R.C. 2917.11 requires that the offender act "recklessly." The definition of the mental state of "recklessly" is set forth in R.C. 2901.22 (C):
 A person acts recklessly when, with heedless indifference to the consequence, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
 This definition is amplified by the Legislative Commission Comment to the code section:
 A person is said to be reckless under the section when, without caring about the consequences, he obstinately disregards a known and significant possibility that his conduct is likely to cause a certain result or be of a certain nature, or that certain circumstances are likely to exist.
 Bailey's initial interest in "flirting" with one so young certainly posed a far greater risk of offending than if he had selected someone older. There was ample evidence that when it became obvious that Lauren was alarmed by his manner toward her, there was ample evidence that he perversely disregarded, and was heedlessly indifferent to, the effect his behavior was having upon her. His decision not to desist, and to follow Lauren into the weight room to further spy upon her, only served to make his conduct worse, suggesting that at some point he began to deliberately torment her. The evidence was more than sufficient to allow the trial court to reasonably conclude that Bailey was acting recklessly when he disregarded Lauren's obvious annoyance and continued to foist his uninvited presence and inappropriate comments upon her.
It should be noted that Bailey, in his argument on appeal, misconstrues the language of subsection (A)(5), asserting that the subsection requires that he have created a "physically offensive condition that presented a risk of physical harm" to Lauren. Subsection (A)(5) contains no physical-harm requirement, however. The language of the subsection prohibits a person from "recklessly caus[ing] inconvenience, annoyance, or alarm to another" by "[c]reating a condition that is physically offensive to persons or that presents a risk of physical harm to persons * * * by an act that serves no lawful and reasonable purpose of the offender." (Emphasis supplied.)
Bailey contends, finally, that his admittedly "dumb comments" served a lawful and reasonable purpose, which was to "flirt with Ms. Wulker, although in an awkward fashion." Even if we ignore the asserted propriety of a twenty-nine-year-old man attempting to flirt with a sixteen-year-old girl, Bailey's self-serving characterization of his behavior as awkward flirtation was certainly not binding upon the trial court. The trial court determined from the testimony that the tenor of his remarks and the nature of his behavior went beyond any acceptable form of courtship. A reasonable person could have determined that Bailey's behavior was neither trifling nor even remotely amorous. The fact that Bailey may have subjectively considered his conduct somehow flirtatious or charming did not lend it any objective legitimacy or reasonableness.
We hold, therefore, that there was sufficient evidence of record for the trial court to have reasonably concluded that Bailey recklessly created a "physical condition." with no lawful or reasonable purpose that caused inconvenience, annoyance or alarm to another under R.C.2917.11(A)(5). Bailey's attack upon the sufficiency of the evidence underlying his conviction is overruled.
In his second assignment of error, Bailey argues that his conviction was contrary to the weight of the evidence. Again, Bailey relies upon his own version of the events. Furthermore, he specifically challenges the evidence concerning Lauren's requests that he leave her alone. According to Bailey, even if it is assumed that Lauren made such requests, there was no proof beyond a reasonable doubt that he ever heard her.
It is well settled that determining the credibility of witnesses is a matter uniquely suited to the trier of fact. Although a reviewing court may assume the role of a thirteenth juror (or, in this case, a second trial judge), the authority to reverse on the weight of the evidence is reserved for the exceptional case in which the fact finder has either lost its way or committed a manifest miscarriage of justice. State v.Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541.
Reviewing the record, we find no basis to conclude that the trial court erred when it credited the testimony of the Wulkers over that of Bailey. If Bailey's version were true, if Lauren were actually flirting with him, then her actions and emotional state afterward made little or no sense. Further, we consider Lauren's testimony strongly indicative of the fact that Bailey heard her when she told him to leave her alone. Lauren testified that she spoke loudly enough for Bailey to hear her, and that she was "pretty sure" that he did hear her. Although Bailey points to the fact that Lauren was turning her back to him, and that there was no evidence that he acknowledged her requests, these facts alone did not prevent a reasonable inference that he heard her. Finally, although Bailey argues that the evidence was not compelling that Lauren was "sufficiently annoyed or alarmed or physically offended" by anything he did, this argument simply ignores the testimony of both Lauren and her mother that she was quite shaken and deeply disturbed by Bailey's behavior toward her.
Bailey's second assignment of error is, accordingly, overruled. In his third and final assignment of error, Bailey argues that the trial court erred in finding that he persisted in his disorderly conduct, thus elevating the crime to a misdemeanor of the fourth degree under R.C.2917.11(E)(3)(a). As this court has held, in order to persist in disorderly conduct, the offender must be actively conducting himself in a disorderly manner and must continue to act in such a manner despite being warned or requested to desist. State v. Reynolds (1985), 25 Ohio App.3d 59,495 N.E.2d 971.
Bailey's argument that he did not persist in his disorderly conduct is essentially that advanced under his first and second assignments of error — that Lauren never asked him to desist, and that, even if she did, there was no proof beyond a reasonable doubt that he heard her. For the reasons we have already stated, we hold that there was evidence that Bailey was told at least twice to leave Lauren alone, and that Bailey heard such requests and simply ignored them. R.C. 2917.11(E)(3)(a), it should be noted, only requires a single request or warning, and Bailey was requested to leave Lauren alone not only once, but twice. The trial court did not err, therefore, when it found Bailey guilty of persistent disorderly conduct.
Bailey's third assignment of error is overruled.
Accordingly, the judgment of the court is affirmed.
Judgment affirmed.
DOAN, P.J., and WINKLER, J., concur.