262 F.3d 856 (9th Cir. 2001)
 GARY EDWARDS, PLAINTIFF-APPELLANT,
v.
CITY OF COEUR D'ALENE; KOOTENAI COUNTY COMMISSIONERS; PIERCE CLEGG, SHERIFF, IN HIS OFFICIAL CAPACITY AS SHERIFF OF KOOTENAI COUNTY; STEVE JUDY, IN HIS OFFICIAL CAPACITY AS MAYOR OF COEUR D'ALENE; NANCY SUE WALLACE, IN HER OFFICIAL CAPACITY AS CITY COUNCIL PRESIDENT OF COEUR D'ALENE; DICK WHITE, SHERIFF'S DEPUTY, IN HIS OFFICIAL CAPACITY AS AGENT OF KOOTENAI COUNTY; BEN WOLFFINGER, CAPTAIN, IN HIS OFFICIAL CAPACITY AS AN AGENT OF KOOTENAI COUNTY'S SHERIFF'S DEPARTMENT; JOHN DOE, GOVERNMENT AGENT, IN HIS OFFICIAL CAPACITY; JANE DOE, GOVERNMENT AGENT, IN HER OFFICIAL CAPACITY, DEFENDANTS-APPELLEES.
 No. 00-35537
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 19, 2001
Filed August 21, 2001
 
 [Copyrighted Material Omitted]
 Counsel Bryan J. Brown, American Family Assn. Law Center, Tupelo, Mississippi, for the plaintiff-appellant.
 Susan P. Weeks, Lukins & Annis, Coeur d'Alene, Idaho, for the defendants-appellees.
 Appeal from the United States District Court for the District of Idaho D.C. No. CV-99-00131-N-EJL Edward J. Lodge, District Judge, Presiding. D.C. No. CV-99-00131-N-EJL.
 Before: Harry Pregerson, A. Wallace Tashima, and Sidney R. Thomas, Circuit Judges.
 
 Opinion by Judge Pregerson
 OPINION
 
 1
 This case involves a lawsuit brought by Gary Edwards ("Edwards") challenging the constitutionality of Ordinance 2920(1)(D), which was enacted by the City of Coeur d'Alene, Idaho ("the City"). COEUR D'ALENE, ID., CODE§§ 9.52.050. Edwards asserts that the ordinance, which prohibits the carrying of signs attached to wooden or plastic handles during parades and public assemblies, abridges his right to free speech under the First and Fourteenth Amendments.[1] The district court rejected Edwards's challenge and granted summary judgment for the City after finding that the ordinance was a valid "time, place, and manner" restriction on speech. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and now reverse.
 
 I. FACTS and PROCEDURAL HISTORY
 
 2
 On July 18, 1998, the Aryan Nations conducted a march through the downtown area of the City. Edwards was arrested by a Kootenai County sheriff's deputy as he protested the march carrying a sign that read "Stop the Nazis Now." The arrest occurred after Edwards was asked to surrender the wooden handle and wooden slat supports of his sign and refused to do so. At the time, no City law banned the use of sign supports. Edwards's arrest was an alleged violation of Idaho Code §§ 18-705, which criminalizes resisting and obstructing a peace officer in the discharge of his duties.
 
 
 3
 On April 1, 1999, Edwards filed a motion in federal district court against the City and Kootenai County seeking preliminary and permanent injunctive relief.[2] Specifically, Edwards alleged that the deputy sheriff who arrested him was applying the City's "zero tolerance for weapons" policy in violation of Edwards's right to free speech, due process, and equal protection.[3] Edwards asked the district court to grant injunctive relief based on his fear that the City would employ its "zero tolerance" policy in the future to violate his constitutional rights. The City did not respond to Edwards's motion.
 
 
 4
 On May 21, 1999, the district court granted Edwards's motion for temporary injunctive relief against the City. The court ruled that:
 
 
 5
 Defendant City shall not enforce any policies against Plaintiff's carrying of signs with handles at any future City events unless said policy is duly enacted by the City's elected representatives, constitutes reasonable time, place and manner restrictions addressing symbolic protest and sign construction, and is applied in an even-handed fashion after being duly proclaimed as the law.
 
 
 6
 Three days later, the City enacted Ordinance 2920.[4] COEUR D'ALENE, ID., CODE §§ 9.52.050. Section 1 of Ordinance 2920 consists of five subsections: A, B, C, D, and E.[5] Section 1(A) provides that "[i]t shall be unlawful for any person to have in his possession or to have in any vehicle any weapon while participating in or attending a parade or public assembly." Section 1(B) outlaws the possession of a weapon"within 1,000 feet of the perimeter of a parade or public assembly," unless the person possesses the weapon "in his private dwelling or place of business." Id. Section 1(C) exempts from the provisions of the ordinance "[m]embers of any United States Military Veteran's organizations."[6]
 
 Section 1(D) states:
 
 7
 Placards or signs may be carried [during parades and public assemblies] subject to the following limitations. Placards or signs may be worn or carried but shall not be affixed to any wooden, plastic or other type of support. Nor shall the placards or signs themselves be constructed of any hard material, such as wood, hard plastic or metal. No signs shall be draped or affixed to any City property.
 
 
 8
 (emphasis added).
 
 
 9
 Section 1(E) provides definitions for key terms in the ordinance, including: parade,[7] public assembly,[8] law enforcement officer,[9] and weapon.[10] A violation of Ordinance 2920(1) is a misdemeanor punishable by a maximum fine of $300 or a prison sentence of up to six months.
 
 
 10
 On June 16, 1999, Edwards filed an amended complaint in federal district court seeking preliminary injunctive relief against the enforcement of Section 1(D) of Ordinance 2920. In his complaint, Edwards stated that he had been arrested on July 18, 1999 for refusing to surrender the wooden handle of his sign while protesting against the Aryan Nations March and that he was "fearful that if he again takes his sign to an Aryan Nations protest . . . he will be arrested" pursuant to Ordinance 2920. Edwards argued that the threat posed by the ordinance was immediate because the City had granted the Aryan Nations a permit to hold a parade in the City on September 4, 1999. Two days later, Edwards amended his complaint to include a facial challenge to the constitutionality of Ordinance 2920.
 
 
 11
 On August 17, 1999, the district court granted Edwards's request for preliminary injunctive relief against the enforcement of Ordinance 2920. The court concluded that"the exemption provided by subsection C to `[m]embers of any United States Military Veteran's organizations' most likely renders Ordinance 2920, section 1(D), constitutionally infirm. It is beyond doubt that a governmental entity cannot favor one group over another when it regulates First Amendment expression." The City then agreed to strike the veteran's exemption in Section 1(C) from the ordinance.
 
 
 12
 Reiterating his claims that Ordinance 2920 was unconstitutional under the First and Fourteenth Amendments, Edwards moved for summary judgment. On June 2, 2000, the district court denied Edwards's motion and granted summary judgment sua sponte for the City. The district court found that the City had "conceded to remedying the flaw" in the ordinance by striking the veteran's exemption in Section 1(C). The district court stated that, while picketing was a form of speech protected by the First Amendment, Section 1(D)'s regulation of picketing was a valid time, place, and manner restriction. Specifically, the court found that Section 1(D) of the ordinance was content neutral, narrowly tailored to serve a substantial government interest in public safety, and allowed for ample alternative channels of communication. The district court further found that the ordinance was not unconstitutionally vague. Edwards appeals.[11]
 
 II. STANDARD OF REVIEW
 
 13
 We review de novo the district court's grant of summary judgment to determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).
 
 
 14
 III. SECTION 1(D) of ORDINANCE 2920 IS NOT A VALID TIME, PLACE, and MANNER RESTRICTION OF SPEECH
 
 
 15
 The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. " U.S. CONST. amend. I. It is well established that peaceful picketing and parading are forms of expressive communication protected by the First Amendment. Carey v. Brown, 447 U.S. 455, 466-67 (1980) (observing that "picketing . . . has always rested on the highest rung of the hierarchy of First Amendment values . . . .") (internal quotations omitted); Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 568-69 (1995) (marching in a parade is expressive conduct protected by the First Amendment).
 
 
 16
 Section 1(D) of Ordinance 2920 bans the attachment of "any wooden, plastic or other type of support " to signs carried during parades and public assemblies in the City's streets. Because the ordinance clearly regulates picketing -which takes place in a public forum, often occurs during a parade or public assembly, and traditionally involves the use of signs with "supports" -the ordinance necessarily regulates expressive activity protected by the First Amendment. Carey, 447 U.S. at 466-67; Hague v. CIO, 307 U.S. 496, 515 (1939); NAACP v. City of Richmond, 743 F.2d 1346, 1355 (9th Cir. 1984).
 
 Time, Place, and Manner
 
 17
 Although picketing is protected under the First Amendment, the State may pass laws to regulate it, provided that the laws are reasonable "time, place and manner" restrictions that "may be necessary to further significant governmental interests." City of Chicago v. Mosley, 408 U.S. 92, 99 (1972) (citations omitted). Specifically, an ordinance imposing time, place, and manner limitations on picketing in city streets is constitutional if: (1) it is content neutral; (2) it is narrowly tailored to serve a significant government interest; and (3) it leaves open ample alternative means of communication. Frisby v. Schultz, 487 U.S. 474, 481 (1988) (citations and internal quotations omitted). If the ordinance fails to satisfy any one of these three prongs, it is unconstitutional.
 
 1. Content Neutrality[12]
 
 18
 "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (citation omitted). An ordinance is content-neutral if it can be "justified without reference to the content of the regulated speech[.]" Clark v. Community for Creative NonViolence, 468 U.S. 288, 293 (1984).
 
 
 19
 The district court found that the Coeur d'Alene City Council enacted Ordinance 2920 as part of a larger goal of "maintaining peace during a parade or public assembly." Specifically, the City sought to prevent injury to its citizens, which might occur if parade participants and protestors used their sign handles as weapons to inflict injury on others.
 
 
 20
 We agree that the ordinance does not regulate by reference to speech and that it is not discriminatory on its face.[13] The ordinance does not single out any particular person or group based on viewpoint, but instead applies to all sign-holders equally.[14]
 
 
 21
 Section 1(D) of the ordinance imposes a flat ban on the carrying of "any wooden, plastic or other type of support" attached to signs carried during parades and public assemblies. COEUR D'ALENE, ID., CODE §§ 9.52.050 (emphasis added). The language of Section (1)(D) -specifically, the use of the word "any" to modify "support," and its listing of sign support materials to include all "type[s]" -indicates that the ban applies to every sign handle, regardless of what the sign says or who is carrying it. Because there is no evidence that the ordinance is designed to "favor some viewpoints or ideas at the expense of others," City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984), and because it was enacted to combat an evil unrelated to speech, One World Family Now v. City of Honolulu, 76 F.3d 1009, 1012 (9th Cir. 1996), the ordinance is content-neutral.
 
 2. Narrowly Tailored
 
 22
 The City bears the burden of demonstrating that Ordinance 2920 advances a "substantial governmental interest" and that it is "narrowly tailored" to prevent "no more than the exact source of the `evil' it seeks to remedy." Frisby, 487 U.S. at 485; Bay Area Peace Navy v. United States, 914 F.2d 1224, 1227 (9th Cir. 1990). The district court described the City's goal in enacting a ban on sign supports as "prevent[ing] rigid-support materials used on signs from being used as weapons and turned upon police officers, marchers, or other demonstrators," and characterized this interest as substantial.
 
 
 23
 There is no doubt that the City has a substantial interest in safeguarding its citizens against violence. See, e.g., Hill v. Colorado, 530 U.S. 703, 715 (2000) ("It is a traditional exercise of the States' `police powers to protect the health and safety of their citizens.' ") (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996)). But the fact that the City has a substantial interest in public safety does not end the inquiry. The City must also show that Ordinance 2920(1)(D) is narrowly tailored to advance that interest.[15] Specifically, the First Amendment demands that municipalities provide "tangible evidence" that speech-restrictive regulations are"necessary" to advance the proffered interest in public safety. Bay Area Peace Navy, 914 F.2d at 1227. See also Mosley, 408 U.S. at 100-01 (1972) ("[W]e reject the city's argument that . . . it may prohibit all nonlabor picketing because, as a class, nonlabor picketing is more prone to produce violence than labor picketing. Predictions about imminent disruption from picketing involve judgments appropriately made on an individualized basis, not by means of broad classifications . . . ."); United States v. Griefen, 200 F.3d 1256, 1261 (9th Cir. 2000) (finding that "an actual threat [of violence ] posed by the protestors and the appellants clearly existed" thus justifying the government's interest in closing off a designated area of national forest); Project 80's, Inc. v. City of Pocatello, 942 F.2d 635,638 (9th Cir. 1991) (rejecting city's proffered interest in public safety after finding that "there is little evidence" in the record that the ordinances banning door-to-door solicitation actually protected citizens from crime).
 
 
 24
 The City relies on our decision in Foti v. Menlo Park, 146 F.3d 629 (9th Cir. 1998), to argue that Ordinance 2920(1)(D) is narrowly tailored to advance its interest in public safety. But Foti provides only superficial support for the City's position. In Foti, abortion protestors brought a First Amendment challenge to a city ordinance that regulated picketing on public property by limiting the size of picket signs to"three square feet in area." Id. at 634 n.3. The protestors argued that the limitation on the size of the signs they could carry constrained their ability to communicate their message in the most effective way. Id. at 640-42. The city countered that the size regulation was necessary to promote a substantial interest in "traffic safety." Id. at 640.
 
 
 25
 In Foti, we examined closely the city's assertion that the regulation promoted its interest in traffic safety:"[The picketers] demonstrate within several yards of a bus stop. A bus must pull to the side of the street, allow passengers to board and disembark, and safely merge with oncoming traffic. Extremely large or numerous picket signs nearby could well interfere with bus's operation or with pedestrian circulation on the sidewalk." Id. at 640-41. We then analyzed whether the ordinance's regulation of the size and number of picket signs posed a significant burden on the appellants' ability to communicate their message, and concluded that it did not. Id. at 641. Specifically, we found that there was "substantial evidence that pedestrians, a substantial portion of[the protestors'] intended audience, could see and read their three square foot signs," and thus that the regulation's burden on speech was "minimal." Id. at 642. In reaching the opposite conclusion in this case, we think it is important to point out why Foti is distinguishable.
 
 
 26
 In determining that a sufficient nexus existed between the city's proffered interest in traffic safety and its regulation of picket signs, the Foti court was able to rely upon empirical evidence. In this case, however, the record reveals little factual support for the City's claim that Ordinance 2920's complete ban on sign supports is necessary to advance the goal of preventing violence against police officers, paraders, and protestors.[16] The City does not cite any parade or public assembly prior to the passage of the ordinance in which Coeur d'Alene citizens used sign handles as instruments of violence.[17]
 
 
 27
 In fact, the only evidence in the record regarding the origin of the ordinance's ban on sign supports consists of Edwards's legal challenge to his 1998 arrest, which predated the ordinance by roughly eight weeks.[18] As stated above, on the date of Edwards's arrest, the City had no law banning the carrying of signs with handles. Although Edwards was arrested after he refused to surrender the wooden handle of his sign, his act of holding the sign itself was not the basis for the arrest. Rather, it was Edwards's refusal to stop holding the sign that was deemed illegal. Ruling for Edwards in that action, the district court stated: "Defendant City shall not enforce any policies against Plaintiff's carrying of signs with handles at any future City events unless said policy is duly enacted by the City's elected representatives . . . ."
 
 
 28
 Ordinance 2920, which specifically prohibits the carrying of signs "affixed to any . . . type of support," became law three days after the district court ruled in Edwards's favor. The wording of the ordinance, combined with the timing of its enactment, suggests that the City's primary intent was to provide a legal predicate for future arrests of picketers similarly situated to Edwards rather than to prevent a clear threat to the public safety.
 
 
 29
 The lack of empirical evidence supporting the ordinance's sign support ban would be less problematic if the impact on speech were negligible. But the ordinance's total ban on sign supports has an undeniable impact on the manner in which a signholder communicates with the public. As explained more fully below, without access to sign handles, signholders in parades and public assemblies cannot hoist their signs in the air so that the messages are visible above a crowd. The ordinance also makes it much more difficult to display larger, heavier signs and banners. And, as Edwards points out, the classic image of a picketer -dating back to the early days of labor protests -is of an individual holding aloft a sign-bearing standard. Because social, economic, and political protests are commonly associated with picket signs attached to handles, the ordinance's ban precludes an important communicative aspect of public protest.
 
 
 30
 Moreover, while the City need not employ the least restrictive alternative in promoting its interest in public safety, "if there are numerous and obvious less-burdensome alternatives to the restriction on [protected] speech, that is certainly a relevant consideration in determining whether the`fit' between ends and means is reasonable." City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 418 n.13 (1993); see also Project 80's, 942 F.2d at 638 (stating that"restrictions which disregard far less restrictive and more precise means are not narrowly tailored"); Students Against Apartheid Coalition v. O'Neil, 660 F. Supp. 333, 339-40 (W.D. Va. 1987) (holding that regulations prohibiting students from constructing and maintaining on-campus shanties to protest apartheid were not narrowly tailored to serve University's interest in protecting campus's "esthetic integrity" because the shanties did no damage to campus buildings and lawns). A sampling of ordinances employed by other cities regulating picketing at parades and public assemblies demonstrates that less restrictive alternatives to Ordinance 2920 are readily available.
 
 
 31
 For example, a Los Angeles ordinance safeguards its citizens against violent outbursts during "any demonstration, rally, picket line or public assembly" by requiring all sign supports to be "one-fourth inch or less in thickness and two inches or less in width." LOS ANGELES, CA., MUNI. CODE §§ 55.07. While the Los Angeles ordinance does have an impact on expressive conduct, it uses less restrictive means than Ordinance 2920.[19] The ordinance makes parades and large public gatherings safer by banning materials that are most likely to become dangerous weapons without depriving the city's residents of the opportunity to parade or protest with "traditional" picket signs.
 
 
 32
 A similar ordinance is in effect in Charlotte, North Carolina. Under the Charlotte ordinance, individuals seeking to picket peacefully may use placards attached to sign supports, provided that the sign supports "shall not exceed forty (40) inches in length, must be made of wood, shall not exceed three-fourths (3/4) of an inch in diameter at any point, and must be blunt at each end." CHARLOTTE, N.C. CODE §§ 15-26(a)(3).
 
 
 33
 This small sampling of ordinances provides examples of less drastic ways in which municipalities can balance the safety interests of the public and the free speech rights of picketers. By regulating the length, width, composition, and sharpness of sign supports, city lawmakers can reduce the risk of serious injury to citizens during parades and public assemblies without banning the use of the "traditional " picket sign altogether. Viewed in this context, Ordinance 2920(1)(D)'s flat ban on all sign supports burdens substantially more speech than is necessary, and the City provides little empirical evidence suggesting that such stringent measures are necessary to advance its interest in public safety. For these reasons, we conclude that Ordinance 2920(1)(D) does not meet the second prong of the time, place, and manner test because it is not narrowly tailored to further the City's interest in public safety.
 
 3. Alternative Means of Communication
 
 34
 If an ordinance effectively prevents a speaker from reaching his intended audience, it fails to leave open ample alternative means of communication. Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 654 (1981) ("The First Amendment protects the right of every citizen to `reach the minds of willing listeners and to do so there must be opportunity to win their attention.' ") (quoting Kovacs v. Cooper, 336 U.S. 77, 87 (1949)). The City argues that Ordinance 2920(1)(D) permits Edwards to convey his message through alternative channels. In support of this argument, the City argues in its brief that under the ordinance, Edwards is free to "hand out leaflets, carry signs (without supports and made of non-rigid materials), sing, shout, chant, perform dramatic presentations, solicit signatures for petitions and appeal to passersby."
 
 
 35
 It is not clear, however, that Edwards could employ any of the communicative methods listed above effectively to "reach the minds of willing listeners and . . . win their attention." Heffron, 452 U.S. at 654 (internal quotation marks omitted). As a general rule, parades and public assemblies involve large crowds and significant noise. While some of these mass gatherings are less populated and more orderly than others, it is often difficult to see more than a few feet in any direction, or to hear anyone who isn't standing nearby. These circumstances make it difficult for individual protestors or participants to convey their messages to the broad audience they seek to attract.
 
 
 36
 The City's assertion that Edwards could transmit his message effectively by shouting, singing, holding a sign in his hands, or leafletting lacks force in the context of a march or parade, where individual voices cannot be heard above the din, and "dramatic performances" and hand-held signs are easily swallowed up by the crowd. Signs attached to supports such as poles or sticks are effective tools by which to overcome the communication problems endemic to these types of situations. A sign that can be hoisted high in the air projects a message above the heads of the crowd to reach spectators, passersby, and television cameras stationed a good distance away.
 
 
 37
 Because there is no other effective and economical way for an individual to communicate his or her message to a broad audience during a parade or public assembly than to attach a handle to his sign to hoist it high in the air, Section 1(D) of Ordinance 2920 prevents Edwards from reaching his intended audience. We conclude, therefore, that Ordinance 2920(1)(D) also does not comport with the third prong of the time, place, and manner test because it does not allow for ample alternative means of communication.
 
 CONCLUSION
 
 38
 We reverse the district court's grant of summary judgment to the City with respect to Edwards's challenge to the constitutionality of Ordinance 2920(1)(D)'s ban on sign supports. Section 1(D)'s ban on sign supports is an invalid time, place, and manner restriction on speech because it is not narrowly tailored to serve the City's interest in public safety and it fails to leave open ample, alternative channels of communication to picketers. Accordingly, we REVERSE and REMAND to the district court with instructions to enter a permanent injunction against the enforcement of Section 1(D) of the ordinance.
 
 
 
 Notes:
 
 
 [1]
 Edwards also challenges the constitutionality of Ordinance 2920(1)(D) on the grounds that it is void for vagueness. See Grayned v. City of Rockford, 408 U.S. 104, 108 (1972) ("Vague laws may trap the innocent by not providing fair warning."). Because we reverse on the ground that the regulation is an invalid time, place, and manner restriction, we do not reach the merits of Edwards's void for vagueness challenge.
 
 
 [2]
 On May 11, Edwards's claims against Kootenai County were dismissed with prejudice.
 
 
 [3]
 Edwards later amended his complaint to remove his claim that the City had promulgated an unconstitutional "zero tolerance for weapons" policy that resulted in his arrest. Edwards also dropped his claim for damages against the City.
 
 
 [4]
 Ordinance 2920 amended and effectively replaced Ordinance 2914. Ordinance 2914 was enacted on May 4, 1999, following Edwards's arrest and the initiation of his lawsuit against the City. The two Ordinances are identical with respect to Section 1(D) -the provision challenged here.
 
 
 [5]
 Ordinance 2920 contains four other sections, enumerated below, none of which are at issue in this appeal.
 Section 2 provides that "[a]ll ordinances and parts of ordinances in conflict with this ordinance are hereby repealed."
 Section 3 provides that "[n]either the adoption of this ordinance nor the repeal of any ordinance shall, in any manner, affect the prosecution for violation of such ordinance committed prior to the effective date of this ordinance."
 Section 4 provides that "[t]he provisions of this ordinance are severable and if any provision, clause, sentence, subsection, word or part thereof is held illegal, invalid, or unconstitutional or inapplicable to any person or circumstance, such illegality, invalidity or unconstitutionality or inapplicability shall not affect or impair any of the remaining provisions, clauses, sentences, subsections, words or parts of this ordinance or their application to other persons or circumstances."
 Section 5 provides that the ordinance shall take effect upon its passage and publication.
 
 
 [6]
 Section 1(C) also exempts "[l]aw enforcement officers; [o]fficers and soldiers of the United States Armed Forces and the Idaho National Guard and United States Reserve Officer Training Corp cadets."
 
 
 [7]
 "Parade" is defined as, inter alia, "any dash, demonstration, march, marathon, meeting, motorcade, parade, procession, public assembly, race, rally, or like activity consisting of persons, animals, or vehicles or a combination thereof upon the street within the City that interferes with or has a tendency to interfere with the normal flow or regulation of traffic upon the streets."
 
 
 [8]
 "Public Assembly" is defined as "any meeting, demonstration, rally or gathering of more than twenty-five (25) persons for a common purpose as a result of prior planning that interferes with or has a tendency to interfere with the normal flow or regulation of pedestrian or vehicular traffic or occupies any street. A `public assembly' for purposes of this section shall include the time period beginning one (1) hour prior to the beginning of the public assembly and shall conclude one (1) hour after the end of the public assembly. For purposes of this section, `public assembly' shall not include a group of more than two persons assembled together as part of an otherwise lawfully certified weapons education program."
 
 
 [9]
 "Law Enforcement Officer" is defined as "any court personnel, sheriff, constable, peace officer, state police officer, correctional, probation or parole official, prosecuting attorney, city attorney, attorney general, or their employees or agents, or any other person charged with the duty of enforcement of the criminal, traffic or penal laws of this state or any other law enforcement personnel or peace officer as defined in chapter 51, title 19, Idaho Code."
 
 
 [10]
 "Weapon" is defined as"any pistol, rifle, shotgun or other firearms of any kind whether loaded or unloaded, air rifle, air pistol, explosive, blasting caps, knife, hatchet, ax, slingshot, blackjack, metal knuckles, mace, iron buckle, baseball bat, ax handle, chains, crowbar, hammer, stick, pole, or other club or bludgeon or any other instrumentality, customarily used or intended for probable use as a dangerous weapon."
 
 
 [11]
 Edwards also filed a motion in district court seeking preliminary relief from the district court's June 2, 2000 order granting summary judgment to the City. Edwards sought to enjoin the June 2, 2000 order so that he could protest an Aryan Nations march, scheduled for July 16, 2000, using a "traditional" picket sign. The district court denied Edwards's motion on July 14, 2000.
 
 
 [12]
 In his opening brief, Edwards argues that his First Amendment challenge extends to Ordinance 2914, which was effectively replaced by Ordinance 2920. Because it is clear that Ordinance 2920 was intended to supercede Ordinance 2914, we consider only Edwards's challenge to the constitutionality of Ordinance 2920. See, e.g., MacDonald v. City of Chicago, 243 F.3d 1021, 1025 (7th Cir. 2001) (finding that enactment of second, superseding ordinance renders moot all claims arising out of the first ordinance).
 
 
 [13]
 The district court struck the exemption for veterans contained in Section 1(C) of the ordinance, which arguably would have permitted veterans to carry signs with handles. Edwards had also argued before the district court that the ordinance was not content neutral because Section 1(E) exempted "lawfully certified weapons education program[s]" from its definition of "parades" and "public assemblies." The district court rejected this argument, and Edwards does not renew it on appeal.
 
 
 [14]
 On appeal, Edwards challenges for the first time the portion of Section 1(C) providing that "[l]aw enforcement officers . . . soldiers of the United States Armed Forces and the Idaho National Guard and. . . United States Reserve Officer Training Corp cadets" are "exempted from the provisions" of Ordinance 2920 that ban the carrying of weapons, sign supports, and signs made of specified materials. Because Edwards did not raise this challenge below, he has waived it. In any case, it is highly probable that an exemption permitting law enforcement officers to carry weapons during parades and public assemblies would pass constitutional muster. See, e.g., Raleigh, N.C., Code §§ 12-1060(d) (exempting law enforcement officers from prohibition against possession of firearms and dangerous weapons during parades).
 
 
 [15]
 The City is not required to show, however, that Ordinance 2920 represents the least restrictive means of attaining this goal. One World Family Now, 76 F.3d at 1014.
 
 
 [16]
 The City argues in its brief that "the district court had deposition testimony before it that demonstrators had turned their`traditional' picket signs against officers at the Aryan parade that occurred after the enactment of the ordinance in an attempt to hit them. " (emphasis added). The City refers to Coeur d'Alene Chief of Police David Scates's description, in his deposition testimony, of a newsclip that shows "someone carrying a flag on some type of . . . wood, who was swinging it . . . toward two officers." Scates stated that neither officer was hit and no report of the incident was made. This description, if accurate, may or may not tend to support the City's claim that the sign-handle banning provision of the ordinance advances its interest in public safety. If the object being swung was a flagpole, it is not regulated by the ordinance, which regulates fixtures attached to signs and placards, not fixtures attached to flags. It is certainly true that the City is not required to wait until individuals are seriously injured by sign handles during a parade or public assembly before it may regulate how signs are constructed. But it is equally true that proof that the City's public safety interest is well-taken does not justify the enactment of a flat ban on all sign handles carried during parades and public assemblies, regardless of height, width, weight, and composition, particularly when the carrying of flagpoles is not barred or their size regulated.
 
 
 [17]
 Indeed, the record indicates the opposite. In his deposition, City Police Captain Ken Timmons was asked if, prior to the enactment of Ordinance 2920, the City police had "had a problem with persons marching in parades with weapons." He replied, "I don't think so." Captain Timmons was then asked, "[h]ave you ever had a problem with a police officer being struck by a counterdemonstrator at a parade or public assembly with a stick, let's say?" He responded, "[n]ot that I recall."
 
 
 [18]
 In his deposition, Chief of Police Scates was asked whether the arrest of Edwards for refusing to surrender his sign during his protest of the Aryan Nations march -which occurred prior to the enactment of the ordinance was valid. He replied, "Well, I'll tell you the same thing I've told everyone else since the day I heard about it. It's absolutely a farce."
 
 
 [19]
 Los Angeles Ordinance §§ 55.07, which was adopted by the Los Angeles City Council because of "several incidents where a number of police officers were injured at demonstrations by two-inch by two-inch wooden sign poles," has survived a constitutional challenge on First Amendment grounds. People v. Dury, 152 Cal.App.3d Supp. 23, 26-27 (1983) (upholding the ordinance as a valid time, place, and manner regulation of expressive conduct).